838 So.2d 5 (2002)
AMERICAN INTERNATIONAL GAMING ASSOCIATION, INC.
v.
The LOUISIANA RIVERBOAT GAMING COMMISSION and the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, Department of Public Safety and Corrections
No. 2000 CA 2864.
Court of Appeal of Louisiana, First Circuit.
September 11, 2002.
*8 Benjamin R. Slater, III, New Orleans, Counsel for Plaintiff/Appellant Alvin C. Copeland.
Michael A. Patterson, Baton Rouge, Counsel for Appellee The Louisiana Riverboat Gaming Commission and the Riverboat Gaming Enforcement Division of the Gaming Enforcement Section of the Office of State Police, Public Safety Services, Department of Public Safety and Corrections.
Paul S. West, Baton Rouge, Counsel for Intervenor Treasure Chest Casino, L.L.C.
Before: GONZALES, KUHN, and CIACCIO[1], JJ.
KUHN, J.
In this appeal, we examine whether the trial court properly dismissed various claims asserted against the State of Louisiana by Alvin C. Copeland, the sole shareholder of a corporation that unsuccessfully applied for a riverboat gaming license. We also address whether the trial court properly sustained exceptions and a motion to dismiss raised by a competing applicant, Treasure Chest Casino Inc. ("Treasure Chest"), who intervened because this suit challenged the validity of the license issued to it. We affirm in part, vacate in part, and render. We also remand this matter to afford Copeland the *9 right to amend his petition in a limited manner.

I. FACTUAL AND PROCEDURAL BACKGROUND

A. Louisiana Riverboat Gaming Act Enacted
Pursuant to Acts 1991, No. 753, § 1, the Louisiana Legislature enacted the Louisiana Riverboat Economic Development and Gaming Control Act, La. R.S. 4:501 et seq. ("the Riverboat Gaming Act" or "the Act") This legislation set forth a licensing process for those who sought authorization to conduct gaming activities on riverboats in Louisiana. The Act created two separate bodies within the Department of Public Safety and Corrections and vested each with separate duties and responsibilities to further the Act's purposes. The Riverboat Gaming Enforcement Division ("Division"), created by La. R.S. 4:515, was vested with the responsibility of issuing and denying licenses and investigating the qualifications of each license applicant. La. R.S. 4:518. The Division was authorized to issue up to fifteen licenses to conduct gaming activities upon a riverboat and up to six licenses could be granted for riverboats that operated from any one parish. La. R.S. 4:525. The Riverboat Gaming Commission ("Commission"), created by La. R.S. 4:510, was a rule and policy-making body comprised of seven members appointed by the governor and confirmed by the Louisiana State Senate. The Act gave the Commission the power to promulgate rules and to determine riverboat sailing routes, minimum insurance levels for licensees, riverboat design specifications, and procedures for negotiable instruments transactions. Beyond that, the Act vested the Commission with oversight authority over the Division by giving the Commission the power to "hear and determine all appeals relative to the granting, suspension, revocation, condition, or renewal of all licenses, permits, and applications." La. R.S. 4:511(1).

B. The Commission Promulgates Rules
The Commission promulgated rules to implement the Act.[2] Commission Rule § 303 provided that "each person seeking approval of riverboat plans" must "submit for advance approval by the Commission an application for a certificate of preliminary approval." Commission Rule § 315 provided that the Commission "shall evaluate each application" and "shall approve those applications ... it deems to be in the best interest of the state and locale of the proposed operation ...."[3]

C. Copeland Files Suit
This litigation arises from the following factual scenario set forth in Copeland's petition.[4] American International Gaming Association, Inc. ("AIGA") submitted an application for a certificate of preliminary approval ("Certificate") on December 11, 1992, and another application with supplemental information on February 22, 1993. AIGA proposed a riverboat route and other *10 operations at the Kenner Laketown Harbor Park ("Laketown") on the shores of Lake Pontchartrain. Along with its application, AIGA submitted its application and evaluation fees.[5] On February 14, 1993, AIGA also applied for a gaming license from the Division and submitted the filing fee required for its background investigation.[6]
AIGA further alleged that Treasure Chest submitted an application for a Certificate on March 8, 1993. It also proposed locating its gaming riverboat at Laketown. The Commission held a public hearing on the Treasure Chest application. On April 29, 1993, Treasure Chest modified its application, proposing that its riverboat would be located at Rivertown, U.S.A. on the banks of the Mississippi River in Kenner. On June 4, 1993, the Commission held a public hearing at which AIGA made a presentation on its application for a Certificate.
According to AIGA's allegations, the Commission received a total of 43 applications for Certificates, with six of those seeking preliminary approval to operate a riverboat in Kenner, Louisiana. Prior to a June 18, 1993 Commission meeting, the Commission had approved eight applications but none of those approved involved proposals to locate a riverboat in Kenner. During the meeting, the Commission approved seven more applications.[7] The Commission granted Treasure Chest's application for a Certificate for its Rivertown location as one of these seven but did not grant AIGA's application.
AIGA submits that several months later, Treasure Chest sought permission to modify its Certificate to move the site of its proposed operations back to Lake Pontchartrain as called for in the original Treasure Chest application. On November 13, 1993, the Commission granted Treasure Chest's request despite AIGA's objection. On November 23, 1993, AIGA filed suit in the Nineteenth Judicial District Court seeking the reversal of the Commission's decisions to grant Treasure Chest a Certificate and to grant its request to modify the location of its proposed operations.[8] Both the Commission and the Division were named as defendants.
In response, the Commission and the Division filed numerous exceptions. Before the trial court ruled on these exceptions, however, the Division issued a license to Treasure Chest on May 17, 1994. *11 AIGA ultimately did not receive either a Certificate or a license.[9]

C. Gaming Legislation Revised
While this suit was pending, the Louisiana legislature addressed the status of the various entities charged with oversight of gaming. By Act 7 of the First Extraordinary Session of 1996, the legislature enacted the provisions of La. R.S. 27:1 et seq., the Louisiana Gaming Control Law ("the Gaming Control Law"), which established the Louisiana Gaming Control Board ("the Board"). The Gaming Control Law became effective May 1, 1996. In accordance with its provisions, the Board became the sole and exclusive regulatory and supervisory board for gaming operations and activities authorized by the Riverboat Gaming Act. La. R.S. 27:31 The Gaming Control Law abolished the Commission and transferred its powers, duties, functions and responsibilities to the Board. 27:31A(2) and 27:31B.

E. Certificate Process Abrogated
During 1996, in an unrelated proceeding, this court ruled that the Commission's regulations that required a potential gaming riverboat licensee to obtain a certificate of preliminary approval from the Commission were null and void. This court concluded that the Commission had exceeded its statutory authority under the Riverboat Gaming Act when it adopted these particular regulations and assessed fees because the Act had granted licensing authority to the Division rather than the Commission. State of Louisiana v. Louisiana State Police Riverboat Gaming Enforcement Division, 95-2355 (La.App. 1st Cir.8/21/96), 694 So.2d 316, 319.

F. Copeland's Litigation Moves Forward
In July 1998, the trial court granted Copeland's motion to substitute himself as plaintiff because AIGA had been dissolved and he was the sole shareholder. Thereafter, on January 21, 1999, Copeland filed an amended petition that named the Board, as successor-in-interest to the Commission, as a defendant. Based on the provisions of the amended petition, Copeland no longer sought reversal of the Commission's action. Rather, he challenged the Division's action of issuing the license to Treasure Chest and asserted that he had been constructively denied a license (Count One). He further claimed that he was entitled to a judgment declaring that the license issued to Treasure Chest was null because the Division had awarded licenses to the applicants that had previously received Certificates from the Commission without independently determining which applicants deserved licenses (Count Two). Copeland also advanced claims for monetary damages, alleging that the Division's actions violated his due process and equal protection rights and constituted a violation of 42 U.S.C. § 1983 (Count Three). He also sought the return of fees paid to the commission (Count Four) and the return of fees paid to the division (Count Five).[10]
*12 On June 4, 1999, Treasure Chest intervened urging that Counts One and Two should be dismissed. It filed exceptions urging the objections of prescription and failure to exhaust administrative remedies. Treasure Chest alternatively raised a motion to dismiss these counts.
Copeland opposed Treasure Chest's exceptions and motions with respect to Count Two, the request for declaratory judgment relief, but conceded that Count One, his appeal of the grant of the original Treasure Chest license, was moot. The term of Treasure Chest's initial license was five years, and it expired on May 17, 1999.[11] Then, in June 1999, Treasure Chest filed a motion to stay discovery that was granted by the trial court "pending consideration of [Copeland's] constitutional claim ...."
In January 2000, the State, through the Board, the Division and the Department of Public Safety and Corrections ("the State") filed a motion for partial summary judgment, seeking dismissal of Counts Two and Three of Copeland's amended petition.[12] Copeland responded by filing a motion for summary judgment on his constitutional claims.
The Court held a hearing to dispose of: 1) the State's partial motion for summary judgment; 2) Copeland's motion for summary judgment on the constitutional claims; and 3) the exceptions and motion filed by Treasure Chest. By judgment dated May 31, 2000, the trial court sustained Treasure Chest's exceptions raising the objections of prescription and failure to exhaust administrative remedies and granted Treasure Chest's motion to dismiss. The trial court further granted the State's motion for partial judgment and denied Copeland's motion for summary judgment with respect to the constitutional claims.[13]
Copeland has appealed, urging that the trial court erred by not maintaining his constitutional claims (raised in Count Three). First, he asserts that his petition *13 alleges "cognizable constitutional claims" based on his allegations that the Division's actions violated his equal protection and procedural and substantive due process rights. Based on these constitutional violations, Copeland asserts he is entitled to a declaratory judgment (Count Two), monetary damages (Count Three), and a return of all monies AIGA paid to the Division (Count Five). Second, he asserts that despite the abrogation of the Commission's rules and the legislative revision of the statutes governing the Commission and the Division, his claims against the State present a justiciable claim because he has alleged that he is entitled to monetary relief. Third, he asserts that he did not fail to exhaust administrative remedies by not first presenting his constitutional claims to the Commission rather than the district court because the Commission did not have authority to dispose of these claims. Based on these contentions, Copeland prays for reversal of those portions of the trial court's judgment that sustain Treasure Chest's exceptions, grant Treasure Chest's motion to dismiss, and grant the State's motion for partial summary judgment.

II. ANALYSIS

A. Claims involving Treasure Chest
When Treasure Chest intervened, it challenged only the counts of Copeland's amended petition that could potentially impact its license, Counts One and Two. Because Copeland did not seek compensatory relief from Treasure Chest, Copeland's remaining claims did not impact Treasure Chest. During the proceedings below, Copeland acknowledged that Count One of his amended petition, which challenged the Division's action of issuing the license to Treasure Chest, was moot. We also conclude that Copeland's claim for a declaratory judgment, asserted in Count Two, is moot. Assuming, as Copeland alleges, that the Division issued a license to Treasure Chest on May 17, 1994, the license issued to Treasure Chest would have expired on May 17, 1999. The provisions of former La. R.S. 4:534 (redesignated as La. R.S. 27:74) provided that the term of an initial license to conduct gaming operations is five years. Thus, the license, which Copeland seeks to have declared invalid, has already expired. At this point, there is no practical significance to rendering a judgment on the issue of the validity of the original license. Cat's Meow, Inc. v. City of New Orleans Through Dept. of Finance, 98-0601 (La.10/20/98), 720 So.2d 1186, 1193.[14]
The trial court should have dismissed the claims asserted in Count Two as moot. Accordingly, we find that the trial court erred in sustaining the exceptions raised by Treasure Chest, and we vacate those rulings. But because the matters raised in both Counts One and Two are moot, we conclude the trial court properly granted Treasure Chest's motion to dismiss.

B. Claims against the State
Copeland contends the State violated his procedural due process and equal protection rights by failing to promulgate ascertainable standards to determine who would receive a license and by arbitrarily issuing licenses. Copeland also asserts that the Division's failure to hold a "meaningful hearing" to address AIGA's application and its failure to give notice that its application would be denied violates his *14 procedural due process rights. In addition, he claims the arbitrary denial of his license violated his substantive due process rights.[15]

1. Jurisdiction of the Trial Court
The State argues that Copeland's appeal of the action of the Division's action was not properly raised before the district court. The State urges that former La. R.S. 4:547A required that Copeland appeal the Division's action to the Commission, as follows:
Any person whose application for a license or permit has been denied by the division or any person adversely affected by an action, order or decision of the division may appeal the action, order, or decision of the division to the commission by filing a notice of appeal with the commission within seven days of certified mailing of notice of the action, order, or decision by the division.
(Italics added.)
Neither AIGA nor Copeland filed an appeal with the Commission before presenting their claims to the district court. The State emphasizes that although the action of the Division that Copeland challenges occurred on May 18, 1994, he did not challenge that action until January, 1999, over four years after the Division's initial decision. And when he did take action, Copeland amended AIGA's original petition that appealed the Commission's action of issuing the license, which had been filed since 1993.
Copeland counters that his failure to appeal the Division's action to the Commission did not affect the validity of Counts Two and Three.[16] He maintains that these claims are based on the Division's violations of his constitutional rights, which could not have been asserted through an administrative appeal under La. R.S. 4:547. He further claims that an appeal to the Commission would have been a vain and useless act since the Division simply awarded licenses to those firms that had previously received Certificates from the Commission.
We find no merit in Copeland's arguments with respect to Count Two, the claim for declaratory relief regarding the validity of Treasure Chest's license. As stated above, since Treasure Chest's license has expired, Count Two is moot. The trial court properly granted the State's partial motion for summary judgment with respect to Count Two.
But we find that the constitutional claims raised in Count Three were properly presented to the trial court. The Commission, *15 which functioned as an administrative agency in the executive branch of state government, did not have the authority to determine these questions of constitutionality. See ANR Pipeline Company v. Louisiana Tax Commission, 2001-2594 to 2001-2600 (La.App. 1st Cir.3/20/02), 815 So.2d 178, 184. Judicial power is vested in Louisiana courts by Article V, Section 1 of the Louisiana Constituion. While administrative agencies have rulemaking authority that shadows the powers of the legislature, they are not authorized to exercise "judicial power" under Art. 5, § 1, unless authorized by the Constitution. La. Const. Art. II, § 2; Albe v. Louisiana Workers' Compensation Corp., 97-0581 (La.10/21/97), 700 So.2d 824, 828.
La. Const. art. V, § 16A grants original jurisdiction in all civil matters to the district courts, unless otherwise authorized by the constitution. And since the Louisiana Constitution fixes the original jurisdiction of the district courts, that original jurisdiction cannot be changed by legislative act. The power to decide these constitutional claims was not and could not be conveyed to the Commission pursuant to La. R.S. 4:547, or any other provision of the River Boat Gaming Act. See ANR Pipeline Company v. Louisiana Tax Commission, 2001-2594, 815 So.2d at 184.
Accordingly, when Copeland amended AIGA's timely-filed original petition to assert his constitutional claims, he invoked the court's original jurisdiction, and the requirements of La. R.S. 4:547 did not apply. Because the State asserts no other basis for challenging the timeliness of Copeland's amendment, we conclude that the trial court properly considered Copeland's constitutional claims.

2. Procedural Context of the Constitutional Claims
The State challenged Copeland's constitutional claims via its motion for partial summary judgment. The State urges that Copeland is not entitled to recover because he has not demonstrated a taking of a constitutionally-protected property interest. Technically, the State has raised an exception of no cause of action but has labeled it as a motion for summary judgment. If we were to determine that the petition fails to state a cause of action regarding these constitutional claims, we would preclude a determination on the motion for partial summary judgment with respect to the claims asserted in Count Three. Thus, on our own motion, we raise the objection of no cause of action. La. C.C.P. art. 927; Treen v. Republican Party of Louisiana, 99-2073 (La.App. 1st Cir.9/26/00), 768 So.2d 273, 277. Also see Noble v. Armstrong, 93-841 (La.App. 5th Cir.3/16/94), 635 So.2d 1199, 1203 (holding that a motion for summary judgment based on insufficiency of allegations cannot be used as a substitute for an exception of no cause of action).
The function of the peremptory exception of no cause of action is to question whether the law extends a remedy to anyone under the factual allegations of the petition. Cleco Corp. v. Johnson, XXXX-XXXX (La.9/18/01), 795 So.2d 302, 304. La. Code Civ. P. art. 1915, as amended by 1997 La. Acts No. 483, § 2, now allows a partial judgment sustaining an exception of no cause of action. See Graf v. Jim Walter Homes, Inc., 97-1143 (La.App. 1st Cir.5/15/98), 713 So.2d 682, 685 n. 2. The exception is tried on the face of the pleadings and the court accepts the facts alleged in the petition as true, determining whether the law affords relief to the plaintiff if those facts are proved at trial. Cleco Corp. v. Johnson, 795 So.2d at 304.

3. Due Process Claims
The Fourteenth Amendment to the United States Constitution provides, *16 in pertinent part, "[n]or shall any State deprive any person of life, liberty or property, without due process of law...." Similarly, Article I, § 2 of the Louisiana Constitution provides that no person shall be deprived of life, liberty, or property, except by due process of law. To claim the protections of due process, a claimant must show the existence of some property or liberty interest which has been adversely affected by state action. Delta Bank & Trust Co. v. Lassiter, 383 So.2d 330, 334 (La.1980); Johnson v. Southern University, 2000-2615 (La.App. 1st Cir.12/28/01), 803 So.2d 1140, 1144-1145. Property interests are not created by the constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules or understandings that secure certain benefits and that support claims of entitlement to those benefits. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). To have a property interest protected by due process, a person must clearly have more than an abstract need or desire for it. He must have a legitimate claim of entitlement to it rather than a unilateral expectation of it. Id.
It is true that a license, once issued, may create a property interest in the holder that is traditionally protected by due process notions. Bell v. Burson, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971); Montecino v. Louisiana, 55 F.Supp.2d 547 (E.D.La.1999). But our state law affords a license applicant no individual entitlement to a license that he seeks. Durham v. Louisiana State Racing Com'n, 458 So.2d 1292, 1295 (La.1984). Accepting all of the allegations of the petition as true, we find no due process violation because neither AIGA nor Copeland had a protected property interest in the benefits conferred by a license that they did not actually hold. Absent a protected property interest, AIGA was not entitled to notice and a hearing before the denial of its application. Board of Regents v. Roth, 92 S.Ct. at 2710; Durham v. Louisiana State Racing Com'n, 458 So.2d at 1295. Likewise, Copeland's allegation that he was denied substantive due process rights by being arbitrarily denied a license fails due to the lack of a protected property interest.
Copeland further complains that the Division acted arbitrarily in granting a license to Treasure Chest and not AIGA. Again, we recognize that the State's action of granting a license to a competitor did not deprive AIGA or Copeland of a property interest. See Delta Bank & Trust Company v. Lassiter, 383 So.2d at 334 (La. 1980). Although the Division was authorized to issue only fifteen licenses, Copeland fails to even contend that it was precluded from obtaining a license due to the Division's issuance of a license to Treasure Chest. We note also that Copeland does not allege that the license issued to Treasure Chest provided for its exclusive authorization to operate a gaming riverboat in the Lake Pontchartrain area.
Accordingly, we conclude that the amended petition fails to allege a violation of state or federal due process rights.

4. Equal Protection Claim
Both the Fourteenth Amendment to the U.S. Constitution and La. Const. art. I, § 3 provide that all persons are entitled to equal protection of the law. These provisions mandate "that persons similarly situated receive like treatment." Whitnell v. Silverman, 95-0112 (La.12/6/96), 686 So.2d 23, 29-30. But the equal protection provisions of the state and federal constitutions do not require absolute equality or precisely equal advantages. Ross v. Moffitt, 417 U.S. 600, 612, *17 94 S.Ct. 2437, 2444, 41 L.Ed.2d 341 (1974); Frederick v. Ieyoub, 99-0616 (La.App.2d Cir.5/12/2000), 762 So.2d 144, 148, writ denied, XXXX-XXXX (La.4/12/2001), 789 So.2d 581.
While equal protection claims may be subject to a different analysis under the federal and state guarantees, a minimal standard of review applies under both provisions where, as here, there is no fundamental right, suspect class, or enumerated characteristic alleged as the basis for discrimination. Progressive Security Ins. Co. v. Foster, 97-2985 (La.4/23/98), 711 So.2d 675, 685-87. Absent a "suspect class" of persons or a "fundamental right," classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the state's goals and only if no grounds can be conceived to justify them. Frederick v. Ieyoub, 762 So.2d at 148 (quoting Clements v. Fashing, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982)).
Copeland's equal protection argument is premised on the assertion that AIGA was treated differently than Treasure Chest because the Division issued a license to Treasure Chest but did not issue one to AIGA. He asserts the Division had no ascertainable rules to distinguish between these two license applicants and, accordingly, there was no justification for treating them differently.
Former La. R.S. 4:530 (redesignated as La. R.S. 27:70 by Acts 1996, 1st Ex.Sess. No. 7, § 3) set forth suitability requirements for those seeking a license to conduct gaming operations on a riverboat. Section 530(A) provided that an applicant must be "a person of good character, honesty, and integrity" and "a person whose prior activities, ... habits, and associations do not pose a threat to the public interest of this state or to the effective regulation and control of gaming ...." Section 530(B) also mandated that a license could not be issued to a person unless the division found that: 1) the applicant was capable of operating a gaming casino; 2) the proposed financing of the riverboat and its operations was adequate and was from a suitable source; 3) the applicant was able to operate a vessel comparable to a riverboat; 4) the applicant had submitted a detailed plan of the riverboat's design; 5) the applicant had designated the docking facilities to be used; 6) the applicant showed adequate financial ability to construct and maintain a riverboat; and 7) the applicant had a good faith plan to recruit, train, and upgrade minorities in all employment classifications.
In determining suitability pursuant to La. R.S. 4:530, the Division was required to consider numerous factors, many of which were subjective in nature. Thus, in order to state an equal protection claim, we find that Copeland must specifically allege how it was similarly situated to Treasure Chest based on those factors. Copeland's petition broadly contends that AIGA was treated differently than Treasure Chest. Yet, he makes no specific allegations addressing how AIGA was similarly situated to Treasure Chest, or that AIGA was as suitable as Treasure Chest, based on the factors addressed in La. R.S. 4:530.
Additionally, to state an equal protection claim, the petition must specifically allege how the Division treated AIGA differently or less favorably than Treasure Chest during the licensing process and how that unjustified disparate treatment resulted in the constructive denial of a license to AIGA. The petition fails to do so.
Accordingly, we conclude that the amended petition also fails to allege a violation of state or federal equal protection rights.

*18 C. Amendment of the Petition
La. C.C.P. art. 934 directs that a judgment sustaining a peremptory exception shall permit amendment of the petition when the grounds of the objection may be removed by amendment, and when the grounds of the objection cannot be removed by amendment, the action shall be dismissed. Amendment is not permitted when it would constitute a vain and useless act. Mercan, Inc. v. City of Baton Rouge, XXXX-XXXX (La.App. 1st Cir.5/11/2001), 797 So.2d 722, 724, writ denied, XXXX-XXXX (La.9/21/2001), 797 So.2d 676 (quoting Premier Games, Inc. v. State through Ieyoub, 99-1297 (La.App. 1st Cir.6/7/99), 739 So.2d 852, 855, writ denied, 99-1710, 99-1679 (La.6/14/99), 745 So.2d 15 and 604, cert. denied, 528 U.S. 1062, 120 S.Ct. 617, 145 L.Ed.2d 512 (1999)). We can not contemplate any amendment that Copeland can make insofar as his due process claim is concerned. Any attempt to allege a deprivation of a property right would constitute a vain and useless act. However, with respect to Copeland's equal protection claim, we acknowledge that, after further discovery, it is possible that he will be able to state a valid claim. Accordingly, we remand this matter for the limited purpose of allowing Copeland the opportunity to amend his petition in order to state an equal protection claim.

D. Propriety of the Partial Summary Judgment in favor of the State
Pursuant to its motion for partial summary judgment, the State sought dismissal of Counts Two and Three of Copeland's amended petition. As explained above, the trial court properly granted the State's partial motion for summary judgment with respect to Count Two because the claim for declaratory judgment was moot. With respect to the claims asserted in Count Three, the petition fails to state a cause of action based on a violation of due process and equal protection rights. Thus, the trial court should have dismissed these constitutional claims on that basis and precluded a ruling on the State's motion for partial summary judgment. Accordingly, we vacate that portion of the trial court's judgment.

III. CONCLUSION
That portion of the judgment granting Treasure Chest's exceptions raising the objections of prescription and failure to exhaust administrative remedies is vacated. That portion of the judgment granting Treasure Chest's motion to dismiss is affirmed.
We affirm that portion of the trial court's judgment that granted the State's motion for summary judgment as it relates to Count Two. We render judgment finding that the petition fails to state a cause of action with respect to Copeland's constitutional claims, and we vacate that portion of the trial court's judgment that granted the State's motion for partial summary judgment as it relates to Count Three. We also affirm that portion of the judgment that denied Copeland's motion for summary judgment on his constitutional claims. Otherwise, the judgment is affirmed. We remand this matter for the limited purpose of allowing Copeland the opportunity to amend his petition to set forth a claim based on a violation of his equal protection rights.
JUDGMENT AFFIRMED IN PART, VACATED IN PART, AND RENDERED. MATTER REMANDED FOR LIMITED FURTHER PROCEEDINGS.
GONZALES, J., concurs and assigns reasons.
*19 GONZALES, J., concurring.
As far back as 1892, in a famous opinion by Justice Oliver Wendell Holmes, the second class status of a mere governmental privilege was engrained into our procedural due process concepts in the case of McAuliffe v. Mayor of New Bedford, 155 Mass. 216, 29 N.E. 517 (1892). The case involved a police officer that had been fired. The Supreme Court dismissed his complaints, holding that a governmental job was a mere privilege. The following excerpt 2 Kenneth C. Davis and Richard J. Pierce, Jr., Administrative Law Treatise § 9.3, at 11-13 (1994) summarizes the evolution of a mere privilege to the status of a constitutionally protected entitlement:
Before 1970, due process applied only to deprivation of "rights," determined primarily with a reference to the common law. Anything else government provided was a mere "privilege," outside the scope of due process protection. Justice Holmes' opinion in McAuliffe v. Mayor of New Bedford, 155 Mass. 216, 29 N.E. 517 (1892), illustrates this approach. The Mayor fired a policeman for expressing views on an issue of public importance contrary to those of the Mayor. The court dismissed the policeman's complaint that the action violated both due process and the First Amendment because a government job is a mere privilege unprotected by the Constitution.
Before 1970, the Court paid little attention to the nature of the decisionmaking procedure required by due process. Typically, the Court held only that due process required a "hearing," without describing the nature of the hearing required. In some cases, the Court's language seemed to imply that due process required an oral evidentiary hearing of the type routinely provided by courts. In ICC v. Louisville & Nashville Railroad, 227 U.S. 88, 93, 33 S.Ct. 185, 57 L.Ed. 431 (1913), for instance, the Court specifically referred to "opportunity to cross-examine witnesses." In other cases, however, the Court's language suggested that due process might be satisfied by a "hearing" less formal than the oral evidentiary hearing routinely available in a court. In Londoner v. Denver, 210 U.S. 373, 383, 28 S.Ct. 708, 52 L.Ed. 1103 (1908), for instance, the Court stated only that "a hearing in its very essence requires that he who is entitled to it shall have the right to support his allegations by argument however brief, and, if need be, by proof, however informal."
The Court abandoned both of these approaches to due process decisionmaking in 1970. It rejected traditional distinction between protected rights and unprotected privileges, holding that at least some statutory entitlements are within the scope of due process protection. At the same time, the Court announced its intention to address explicitly and in detail the issue of how much process is due in each decisionmaking context to which due process applies. The opinions that best explain the Court's transition to its present approach to application of the Due Process Clause are Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), and Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

Goldberg involved a claim by recipients of Aid to Families with Dependent Children (AFDC) that the procedures of the agency charged with responsibility to implement the AFDC program in New York violated the Due Process Clause. The agency provided an opportunity for an oral evidentiary hearing to determine a recipient's continued eligibility for AFDC payments, but that *20 hearing was available only after the payments were discontinued. The agency first decided on the basis of less formal procedures that the recipient was ineligible and terminated benefits based on that initial decision. If the Court had followed its traditional approach to defining property rights, it would have dismissed the complaint of the welfare recipients in a brief opinion stating that welfare benefits are mere privileges that are entitled to no due process protection. Instead, the Court held that welfare payments are property interests within the scope of the Due Process Clause.
The Court reasoned that AFDC payments "are a matter of statutory entitlement for persons qualified to receive them." 397 U.S. at 262, 90 S.Ct. 1011. It quoted from an article by Professor Reich in which he argued that (1) a high proportion of property in the United States consists of intangible entitlements to continuing benefits, (2) a high proportion of those entitlements flow from government, and (3) the traditional legal approach to property protects the entitlements of the rich but not the poor. Reich, Individual Rights and Social Welfare: The Emerging Legal Issues, 74 Yale L.J. 1245 (1965). See also Reich, The New Property, 73 Yale L.J. 733 (1964). Thus, for instance the Court had long extended due process protection to the governmental benefit of a license to practice law, characterizing that benefit as a "right." Schware v. Board of Bar Examiners, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957); Ex Parte Garland, 71 U.S. (4 Wall) 333, 379, 18 L.Ed. 366 (1866). Yet, until Goldberg, the Court had declined to extend due process protection to benefits like welfare or most forms of government employment. The Court found Reich's thesis persuasive, and used it as the basis for its holding in Goldberg that welfare benefits conferred by statute are "property" subject to due process protection. In later cases, the Court stated that it had "fully and finally rejected the wooden distinction between `rights' and `privileges.' ..." Board of Regents v. Roth, 408 U.S. 564, 571, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).
In the present case, the majority opinion correctly determines that the petition fails to allege a violation of state or federal due process. The opinion is correct when it points out that "[o]ur state law affords a license applicant no individual entitlement to a license that he seeks."
The majority opinion says that "[a]bsent a protected property interest, AIGA was not entitled to notice and a hearing before the denial of its application," citing Board of Regents of State Colleges v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The inference I take issue with is the fact that only a vested property right would be entitled to the full protection of due process. Here the claim was neither vested nor a property right, however a vested privilege when and if it arises, under the gaming statutes should be entitled to the same constitutional protection. The Gaming Board argues, as many have in similar settings, "The Louisiana legislature has clearly and explicitly stated that no property interests are created in conjunction with gaming licenses, contracts and permits," relying on the language of La. R.S. 27:2(B), which states in part that:
Any license ... or thing obtained or issued pursuant to the provisions of this Title or any other law relative to the jurisdiction of the board is expressly declared by the legislature to be a pure and absolute revocable privilege and not a right, property or otherwise, under the constitution of the United States or of the State of Louisiana.
*21 This seems to indicate that because the license is a privilege, it somehow escapes the protection of due process. Apparently, the drafters of the gaming statutes were some twenty years behind in their constitutional law research and were under the impression that Justice Holmes' relegation of mere privilege to a second-class status somehow still controlled federal due process concepts.
I think the cases as cited in Professor Davis' treatise make it clear that a license, once issued, albeit a privilege cannot be withdrawn by state action without affording the holders of that license the full procedural protection of due process. The majority opinion in its analysis of the due process claim cites the case of Roth, 92 S.Ct. 2701, but omits any reference to the rejection of "the wooden distinction between `rights' and `privileges.'" The Supreme Court opinion in Roth provides an answer for both a property right analysis and a mere privilege analysis when it says: "The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits." Roth, 92 S.Ct. at 2708. Although this license by legislative pronouncement is a mere privilege, the protection afforded to that privilege only exists once it has been acquired. The United States Supreme Court has recently addressed the issue that an unissued riverboat gaming license is not property (or by inference not yet a privilege) in the case of Cleveland v. U.S., 531 U.S. 12, 121 S.Ct. 365, 368, 148 L.Ed.2d 221(11/7/00), finding "We conclude that permits or licenses of this order do not qualify as "property" within § 1341's compass."
NOTES
[1] The Honorable Philip C. Ciaccio, Judge (retired), Fourth Circuit Court of Appeal, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court. The Honorable Douglas M. Gonzales, Judge (retired), First Circuit Court of Appeal, is serving as judge ad hoc by special appointment of the Louisiana Supreme Court.
[2] These rules were designated as Title 42, Part XIII.101, et seq. of the Louisiana Administrative Code (published in Volume 19, No. 7 of the Louisiana Register at pp. 851-61.) These rules were promulgated as emergency rules on June 18, 1993, and became finally effective on July 20, 1993.
[3] The rules providing for the issuance of the certificates were later declared to be null and void on the basis that the Commission had exceeded its authority in promulgating them. State of Louisiana v. Louisiana State Police Riverboat Gaming Enforcement Division, 95-2355 (La.App. 1st Cir.8/21/96), 694 So.2d 316, 319.
[4] American International Gaming Association Inc. ("AIGA") actually filed the initial petition but Copeland, the sole shareholder of AIGA's assets, was later substituted as plaintiff.
[5] Commission Rule § 303 required each applicant to remit a $25,000 application fee and $5,000 to defray the expenses of the commission in analyzing and evaluating a Certificate.
[6] Former La. R.S. 4:532 (redesignated by Acts 1996, 1st Ex.Sess., No. 7, § 3, eff. May 1, 1996, as La. R.S. 27:89) provided that an applicant was required to submit an initial application fee of $50,000.
[7] Since the Division was authorized to issue only fifteen licenses, the Commission apparently decided to likewise limit the number of Certificates it issued.
[8] AIGA's petition alternatively sought a declaratory judgment that the Gaming Commission Rules prohibited the modification of the Certificate.

At that time the petition was filed, former La. R.S. 5:548 provided:
Any person adversely affected by an action, order, or decision of the commission may appeal to the nineteenth Judicial District Court in accordance with the provisions of the Administrative Procedure Act, except that notice of appeal shall be given to the commission and petition for appeal shall be filed with the district court within ten days of the action, order, or decision of the commission.
Acts 1996, 1st Ex.Sess., No. 7, § 3, eff. May 1, 1996, redesignated the former La. R.S. 4:548 as La. R.S. 27:89. Effective July 7, 2001, La. R.S. 27:89 was repealed by Act No. 1222 of 2001.
[9] According to the allegations of the petition, the Division issued licenses to the same 15 entities that had previously been issued Certificates by the Commission.
[10] AIGA had previously amended its petition in June 1998 to request a refund of all fees paid to the Commission and in September of 1998, to request a refund of all fees that had been paid to the Division.

We note that the January 1999 supplemental and amending petition raised claims that attempted to invoke both the trial court's original and appellate jurisdiction. See Metro Riverboat Associates, Inc. v. Louisiana Gaming Control Bd., XXXX-XXXX (La.10/16/2001), 797 So.2d 656, 660, where the court distinguished between the "judicial review of the decision of an administrative agency" as the "exercise of a court's appellate jurisdiction pursuant to La. Const. art. V, § 16(B)" and "judicial adjudications in the first instance" pursuant to La. Const. art. V, § 16(A), which grants "original jurisdiction in all civil matters" to the district courts. Pursuant to the provisions of La. R.S. 4:547, Copeland was required to seek review of the division's issuance of the license to Treasure Chest by filing a notice of appeal with the Commission. But Copeland did not appeal the Division's action to the Commission before challenging the Division's action in the trial court. Thus, although Copeland postured his claims pertaining to the Division's action as an "appeal," the trial court actually had no appellate jurisdiction over the claims asserted in Count One because the Commission had not reviewed the claim. Id.
[11] Treasure Chest asserted in its opposition memorandum that the Division had conditionally renewed Treasure Chest's license on March 16, 1999. But Copeland did not amend his petition to contest the renewal. Also, Copeland's appeal counsel stated during oral arguments that Copeland waives his claim regarding the constructive denial of a license (addressed in Count One).
[12] The State had also previously filed a motion for summary judgment.
[13] Although Copeland's motion for summary judgment addressed only the constitutional claims, the judgment also granted his motion for summary judgment in part and directed the Clerk of Court to release to Copeland the amount of $20,873, which had been deposited into the Court's registry by the Division. This amount represented the $50,000 application fee minus the costs of the Division's background investigation. The trial court granted the State's motion for partial summary judgment "except as to the reimbursement of the $50,000 fee paid by [AIGA] to the ... [Division]..." although the state's partial motion did not address Copeland's claims for reimbursement of the fees paid to the Division. The judgment also denied Copeland's motion to file a fourth supplemental and amending petition.
[14] The collateral consequences exception to the mootness doctrine does not apply to the claims asserted against Treasure Chest because Copeland has not sought damages or other monetary relief from Treasure Chest. Cat's Meow, Inc. v. City of New Orleans Through Dep't. of Finance, 98-0601 (La.10/20/98), 720 So.2d 1186, 1196.
[15] As previously addressed, Copeland conceded in the proceedings below that Count One, his appeal of the grant of the original Treasure Chest license, was moot. Copeland asserts no arguments on appeal with respect to Count Four, his claim for return of fees paid to the Commission. The State asserts that it has refunded all funds that AIGA paid to the Commission in conjunction with the Certificate process. Otherwise, we note that Copeland's claims against the State are not moot because he seeks compensatory relief. Although the Commission and the certificate process it used no longer exists and the original Treasure Chest license has expired, Copeland's claims for damages are viable under the collateral consequences exception. Cat's Meow, Inc. v. City of New Orleans Through Dep't of Finance, 720 So.2d at 1196.
[16] Copeland also refers to Count Five but the State's partial motion for summary judgment only addressed Counts Two and Three, and Copeland's motion for summary judgment only addressed his due process and equal protection constitutional claims, which were raised in Count Three. Thus, the issue of whether Copeland is entitled to receive a return of the fees paid to the Division is not properly before us. Also, it was not specifically raised as an assignment of error on appeal.