hBROWN, C.J.
Defendants are The Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (Louisiana State University Health Sciences Center referred to hereinafter as “LSUHSC”) and Dr. Fred Stacker, the director of the residency program in oto-laryngology at LSUHSC.[1] Plaintiff is Dr. Peter V. Driscoll, a graduate of the residency program, who was denied the required recommendation that would permit him to take the examination for board certification in otolaryngology. Finding a breach of contract and denial of due process, the trial court awarded plaintiff $780,000 for lost income and $75,000 in general damages, together with legal interest and costs. Defendants appealed. We amend and as amended, affirm.

Factual Background

In 1994, Dr. Peter Driscoll entered the six-year accredited residency program in otolaryngology at LSUHSC. In June 2000, Dr. Driscoll successfully completed the program. Graduation from such an accredited residency program and a recommendation from its program director are prerequisites for eligibility to take an examination to become board certified in otolaryngology.
On June 22, 2000, Dr. Stacker, who was the director of the LSUHSC’s otolaryngol-ogy program, issued a final evaluation (exit letter) with a recommendation that plaintiff was worthy to take the examination for board certification. On June 30, 2000, plaintiff graduated from the program Lwhich, by the terms of his contract, ended his employment with LSUHSC. Plaintiff joined the staff at Minden Medical Center and was considering an offer from them for a job that paid $360,000 annually.
On August 22, 2000, plaintiff was notified by the American Board of Otolaryn-gology that he would not be permitted to sit for the board certification examination because, “we no longer have the required recommendation from your Program Director .... ” This was the first knowledge plaintiff had that the June 22 recommendation from Dr. Stacker had been rescinded.
Dr. Stacker had written a letter dated August 9, 2000, to the board withdrawing his previous recommendation. Gordon Rountree, plaintiffs attorney, requested, without success, copies of this letter several times from Dr. Stacker and Mickey Prestridge, the in-house attorney for LSUHSC. On October 3, 2000, Rountree met with Dr. Stacker in his office seeking a copy of the letter. At this meeting, Dr. Stacker told Rountree that plaintiff “would not be well served by pursuing this any *332 further” and threatened that Dr. Driscoll would lose his license to practice medicine in Louisiana if he filed a lawsuit challenging Dr. Stucker’s decision.
Only after plaintiff instituted this lawsuit and filed a motion for a preliminary injunction did Dr. Stacker and LSUHSC produce the August 9 letter. This occurred on March 26, 2002. An excerpt of the letter reads as follows:
This morning I was informed that Dr. Driscoll engaged in a Private Practice while in training. He used the institution’s facilities and employed a V.A. scrub tech in a University facility on weekends to perform cosmetic surgical procedures. _JjNo departmental or hospital individuals were aware of this (to my knowledge). This is absolutely forbidden by the state and University. There is no question that Dr. Driscoll knew he was violating University rules. (Emphasis added).
Staff privileges and the job offer at Min-den Medical Center required board eligibility. Because of Dr. Stacker’s action, plaintiff was not “board eligible.” Plaintiff accepted a one-year fellowship in cosmetic surgery in California where he earned $15,000 the year beginning November 2000 and ending November 2001.

Procedural Background

On March 26, 2002, Dr. Driscoll filed suit against Dr. Stacker in both his official and individual capacities and against LSUHSC for denial of due process and breach of contract.
On November 22, 2002, plaintiff filed a motion for partial summary judgment which was granted on January 6, 2003. The trial court concluded that defendants denied Dr. Driscoll procedural and substantive due process of law and breached their contact with him.
Trial on the remaining issues was concluded on May 12, 2003. Thereafter, on May 30, 2003, the parties agreed to a consent judgment which resulted in Dr. Stacker issuing the necessary recommendation for plaintiff to be “board eligible” and thus cut off further damages. The trial court found that Dr. Stacker, in his official and individual capacity, and LSUHSC were liable and awarded plaintiff $780,000 in lost wages and $75,000 in general damages, together with legal interest and all taxable costs.
| ^Discussion
Defendants claim immunity under La. R.S. 13:3715.3. They contend that the decision made with respect to Dr. Driscoll was a “peer review committee” function.
La. R.S. 13:3715.3(0) provides as follows:
No member of any such committee designated in Subsection A of this Section or any sponsoring entity, organization, or association on whose behalf the committee is conducting its review shall be liable in damages to any person for any action taken or recommendation made within the scope of the functions of such committee if such committee member acts without malice and in the reasonable belief that such action or recommendation is warranted by the facts known to him. (Emphasis added).
The first step in addressing any claim of immunity under La. R.S. 13:3715.3 is for the court to determine whether the defendants are peer review committee members whose actions on which liability is premised were undertaken as part of the peer review process. Smith v. Our Lady of the Lake Hospital, Inc., 93-2512 (La.07/05/94), 639 So.2d 730, rehearing denied, 96-1837 (La.11/08/96), 683 So.2d 258. If the defendants were peer review committee members engaged in the peer review process, it next must be determined *333 whether there was an abuse of the peer review process, which is a fact question. Smith, supra. ‘Peer review’ is the process by which physicians, hospitals and other health care providers review the performance of other physicians and, when warranted, discipline the reviewed physician for incompetence or unprofessional conduct. Smith, 639 So.2d 730 at 735, n. 2. Essentially, peer review deals with the question of the granting and delineation of medical staff privileges at a hospital or other |Bhealth care facility which is conducted pursuant to and in accordance with the facility’s medical staff bylaws, rules, and regulations.
The trial court found that the instant case was not a peer review situation. We agree. Dr. Driscoll had received the necessary recommendation for board eligibility, completed the residency program, and ended his employment at LSUHSC, when Dr. Stucker summarily and secretly revoked that recommendation. Dr. Dris-coll did not possess, nor was he seeking, medical staff privileges at LSUHSC at the time of Dr. Stucker’s actions. In fact, defendants go to great lengths to point out that Dr. Driscoll had graduated from the residency program and was no longer a resident or practicing physician at LSUHSC at the time of Dr. Stucker’s August 9 letter.
Although LSUHSC’s House Staff Manual provided for due process when adverse action is taken against a resident, which includes notice and the right to respond, Dr. Driscoll was neither notified nor provided any process with reference to Dr. Stucker’s letter of August 9, 2000. Dr. Stucker and LSUHSC refused to even provide a copy of the August 9 letter for over two years, and then only produced the letter on the eve of a preliminary injunction hearing. Under these circumstances, Dr. Stucker’s actions were not “peer review” within the meaning of La. R.S. 13:3715.3. Therefore, Dr. Stucker and LSUHSC are not entitled to La. R.S. 13:3715.3 immunity from liability for damages sustained by Dr. Driscoll.[2]
| (¡Defendants next contend that Dr. Dris-coll did not possess a constitutional, statutory or contractually protected property or liberty interest in receiving a recommendation to the American Board of Otolaryn-gology. More specifically, they contend that a recommendation (that a candidate be permitted to sit for examination for board certification) is not a license, nor does the withholding (or rescission) of such recommendation by the board at defendants’ request deny Dr. Driscoll the ability to practice medicine generally, or even to practice in his chosen specialty. Defendants claim that at most, the recommendation (which was withdrawn) represented a potential prospective enhancement to Dr. Driscoll’s resumé.
The Fourteenth Amendment to the United States Constitution provides, in part, “nor shall any State deprive any person of life, liberty or property, without due process of law....” Similarly, Article I, § 2 of the Louisiana Constitution provides that no person shall be deprived of life, liberty, or property, except by due process of law. To assert the protections of due process, a claimant must show the existence of some property or liberty interest which has been adversely affected by state action. Delta Bank & Trust Co. v. Lassiter, 383 So.2d 330 (La.1980); American Intern. Gaming Ass’n, Inc. v. Louisiana *334 Riverboat Gaming Com’n, 00-2864 (La.App. 1st Cir.09/11/02), 838 So.2d 5; Johnson v. Southern University, 00-2615 (La.App. 1st Cir.12/28/01), 803 So.2d 1140. When protected interests are implicated, the right to some kind of prior hearing is paramount. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Where a person’s good name, reputation, honor, or integrity is at stake because of what the government or state is doing to him, notice and an opportunity to be heard are essential. Roth, supra. Being deprived not only of present employment but of future opportunity is certainly no small injury. Id.
A number of courts have concluded that medical students and residents possessed “property” and/or “liberty” interests in their positions. In Ewing v. Bd. of Regents of Univ. of Mich., 742 F.2d 913 (6th Cir.1984), reversed on other grounds, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), the United States Court of Appeals for the Sixth Circuit concluded that a contractual relationship existed between a medical student and his university and proceeded to hold that an implied understanding that a student shall not be arbitrarily dismissed from his university is a property interest, resting in the contractual relationship between the parties, which can give rise to constitutional protections. Similarly, in Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d 775 (2nd Cir.1991), cert. denied, 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991), a physician brought an action against a public hospital alleging that her due process rights were violated when she was denied her status as chief resident. One of the issues presented was whether the plaintiff possessed a “property” interest in obtaining the position of chief resident so as to trigger the due process protections of the Fourteenth Amendment to the United States Constitution. The United States Court of Appeals for the Second Circuit concluded that the plaintiff did indeed possess a protectable “property” interest in obtaining |sthe chief resident position based upon the defendant’s policies and practices, the defendant’s informational materials regarding the residency program, and the plaintiffs reasonable reliance upon these understandings and representations. Ezekwo, supra. Other cases are in accord with the sound principles of Ewing and Ezekwo applying the holding of the United States Supreme Court in Roth. See, e.g., Ong v. Tovey, 552 F.2d 305 (9th Cir.1977) (finding a property interest in surgical residency subject to due process protections); Navato v. Sletten, 560 F.2d 340 (8th Cir.1977) (holding that a physician who was to receive three years of training required for certification in specialty of psychiatry and was then to render two years of service in state mental hospitals possessed property interest in position cognizable under the Fourteenth Amendment); Waliga v. Board of Trustees of Kent State Univ., 22 Ohio St.3d 55, 488 N.E.2d 850 (1986) (a degree holder possesses a property interest in a degree that cannot be taken away except pursuant to constitutionally adequate procedures).
The overwhelming weight of case law illustrates that Dr. Driscoll possessed a property and liberty interest subject to due process protections. In the materials advertising its otolaryngology residency program, LSUHSC noted its accreditation and that graduation would lead to board eligibility. Because Dr. Driscoll had a property right in the recommendation that would permit him to sit for examination for board certification, he was entitled to a hearing so that he would have an opportunity to refute the derogatory allegations.
*335 19Defendants next contend that the trial court erred in holding that there was no credible evidence of wrongdoing on the part of Dr. Driscoll.
Dr. Stucker’s August 9 letter states, “This morning I was informed ...” (Emphasis added). Obviously, he wrote the August 9 letter the same day that he was “informed” of Dr. Driscoll’s alleged misconduct. Kay Carter, a nurse at the V.A. Hospital, told Dr. Stacker that Kevin Williams, a scrub tech at the V.A. Hospital, told her that Dr. Driscoll, with Williams’ assistance, had been performing cosmetic surgical procedures at LSUHSC’s clinic (while plaintiff was a resident at LSUHSC). Ms. Carter further told Dr. Stacker that after weekends she noticed missing supplies and dirty LSUHSC equipment trays at the V.A. Hospital. She also told Dr. Stacker that Dr. Driscoll and Williams had requested preoperative narcotics from her.
Dr. Driscoll testified that he performed a closed nasal reduction and removed a lesion over a patient’s eye using local anesthetic. He knew of similar procedures being done on weekends in the clinic and was not aware of any rule against it. He did not charge the patient for the services and filled out a clinic sheet documenting the services he had performed. Dr. David Hilton, a part-time attending physician at LSUHSC, testified that performing minor procedures in the clinic over the weekend was acceptable, not unusual, and that he would not find such conduct to be an issue. Additionally, there was no written university rule which forbade what plaintiff had done.
Kay Carter simply repeated the statements and allegations allegedly made by Kevin Williams. Dr. Stacker testified that he never spoke to Kevin | inWilliams. The defendants possessed no direct evidence of any wrongdoing on Dr. Driscoll’s part. Further, Dr. Hilton’s testimony that Dr. Driscoll did not violate any rules in performing simple procedures on one patient on one weekend together with the lack of any written policy demonstrates that Dr. Stucker’s statement in the August 9 letter that such was “absolutely forbidden” was a hyperbole. Defendants failed to produce credible evidence of Dr. Driscoll’s wrongdoing.
Defendants further assert that, although hearsay, what Kevin Williams told Kay Carter should nevertheless have been permitted because it could have been admitted in a hypothetical due process hearing. Defendants cannot blatantly violate Dr. Driscoll’s procedural due process rights for over two years, and then be heard to insist on utilizing the hearsay statement of a witness (Kevin Williams) whose unavailability was due to their delay in order to justify their actions.
Additionally, defendants’ contention that the trial court erred in refusing to admit the proffered testimony of Sgt. Johnson, a V.A. security officer, is likewise without merit. Johnson, like Kay Carter, possessed no firsthand knowledge regarding Dr. Driscoll’s conduct and simply repeated what he had allegedly heard from Kevin Williams. Further, Sgt. Johnson’s statement to Dr. Stacker occurred more than a year after Dr. Stucker’s letter of August 9 rescinding his previous recommendation of Dr. Driscoll’s worthiness and played no part in that decision.
Defendants also contend that they did not have to prove that Dr. Driscoll engaged in wrongdoing, only that they would have reached the lósame decision (to send the August 9 letter to the certification board) had a due process hearing been held. Additionally, defendants claim that in that hearing, they would have been free to consider hearsay evidence.
*336 In Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the United States Supreme Court recognized that plaintiffs would not be entitled to damages if the defendants could prove that, if procedural due process had been afforded, plaintiffs would have been suspended anyway. In other words, if the defendants could demonstrate a substantive basis for the suspensions, then the plaintiffs would only be entitled to nominal damages for the procedural due process violations. Id. Multiple courts following Carey have held that once a plaintiff has established a procedural due process violation, the burden shifts to the defendants to demonstrate the substantive basis for their actions, i.e., that the plaintiff would have suffered the same consequences even if proper procedures had been observed. See, McClure v. Independent School Dist. No. 16, 228 F.3d 1205 (10th Cir.2000); Miner v. City of Glens Falls, 999 F.2d 655 (2nd Cir.1993); Patterson v. Coughlin, 905 F.2d 564 (2nd Cir.1990); Quartararo v. Hoy, 113 F.Supp.2d 405 (E.D.N.Y.2000).
Given defendants’ blatant violation of Dr. Driscoll’s due process rights, and given the fact that defendants refused to provide Dr. Driscoll with a copy of the letter revoking the previous recommendation for over two years, resulting in the loss of witnesses, the trial court acted well within the scope of established due process jurisprudence in shifting the burden to defendants to prove substantive wrongdoing on the part of Dr. Driscoll. As Instated, defendants have failed to show any substantive wrongdoing by Dr. Driscoll.
Defendants contend that the trial court’s award of damages against Dr. Stacker in his individual capacity, for which he would be personally liable, was fundamentally unfair. Defendants claim that Dr. Stacker never took any action with respect to Dr. Driscoll without having it first approved by the faculty of the department, and by his superiors (Dr. Clay and Dr. McDonald) and/or without consulting LSUHSC’s in-house counsel, Mickey Prestridge, for legal advice and guidance.
Personal or individual capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law causing the deprivation of a constitutional right. A state official is individually liable for violating the constitutional rights of his victim. Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Kentucky v. Graham, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); see also, Hafer v. Melo, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). That the State of Louisiana has extended indemnification to its officials accused of violating a plaintiffs’ constitutional rights does not alter the individual’s primary liability. Anderson v. Phelps, 655 F.Supp. 560 (M.D.La.1985); Muhammed v. Bd. of Sup’rs of Southern University, 715 F.Supp. 732 (M.D.La.1989), affirmed, 9 F.3d 104 (5th Cir.1993).
As stated, Dr. Driscoll had a property, liberty, and contractual interest in receiving board eligibility status which was clearly protected by due process principles. The trial court found that Dr. Stacker listened to a 113carrier of tales; that he embraced and embellished those tales. Dr. Stacker’s assertions that his actions were first cleared by legal counsel were rejected by the trial court. The LSUHSC’s in-house attorney was not called to testify.
The evidence presented before the trial court clearly revealed that Dr. Stacker blatantly violated Dr. Driscoll’s rights and was acting outside the scope of his constitutional and contractual obligations to Dr. Driscoll. Under these circumstances, Dr. Stacker is stripped of any official capacity he enjoyed and was properly found liable in his individual capacity *337 for the damages he intentionally inflicted upon Dr. Driscoll.
Defendants finally object to the trial court’s award of $780,000 in lost wages.
The trial court is accorded broad discretion in assessing awards for lost earnings, but there must be a factual basis in the record for the award. Quinn v. Wal-Mart Stores, Inc., 34,280 (La.App.2d Cir.12/06/00), 774 So.2d 1093. A plaintiff bears the burden of proving his claim for lost earnings. Collins v. Shelter Mutual Ins. Co., 36,528 (La.App.2d Cir.12/11/02), 833 So.2d 1166, writ denied, 03-0124 (La.03/24/03), 840 So.2d 539. For purposes of determining damages, the amount of lost earnings need not be proved with mathematical certainty, but by such proof as reasonably establishes the claim, and such proof may consist only of the plaintiffs own testimony. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151, (La.1971); Bruce v. State Farm Ins. Co., 37,704 (La.App.2d Cir 10/29/03), 859 So.2d 296; Clark v. Ark-La-Tex Auction, Inc., 593 So.2d 870 (La.App. 2d Cir.1992). Reasonable certainty is the standard. Finley v. Bass, 478 So.2d 608 (La.App. 2d Cir.1985).
In this case, Dr. Driscoll testified that he had received an offer of $360,000 per year as an ENT in Minden, and that because of Dr. Stacker’s action he could not take the offer and elected instead to take a one year fellowship in cosmetic surgery. The value of that California fellowship was not just the $15,000 he actually received; it was as much or more than what he might have received as an ENT in Minden, Louisiana. The fellowship, along with ENT certification, is a crucial step in becoming certified as a plastic surgeon, which was Dr. Driscoll’s intent even before beginning his residency at LSU. We believe the time he spent between November 2000 and November 2001 when the fellowship ended mitigated all of his damages for lost wages during that time period. However, for 18 months, from December 2001 (when Dr. Driscoll’s fellowship ended) until May 30, 2003 (after which Dr. Driscoll was board eligible for ENT certification), he should be entitled to $30,000 per month or $540,000, less the amount of money he actually made (or could have made) here in Shreveport. Because of start-up business expenses, Dr. Driscoll actually earned and was projected to earn a negative net income for the period between December 2001 and June 2003. Therefore, the trial court’s award of $780,000 lost earnings to Dr. Driscoll is reduced to $540,000. The general damage award of $75,000 is affirmed.

11BConclusion

For the foregoing reason, we amend to reduce the total award to $615,000 together with legal interest and cost.
AFFIRMED as AMENDED.

. Otolaryngology is the branch of medicine that deals with diagnosis and treatment of diseases of the ear, nose, and throat.

. Furthermore, we note that the trial court found that Dr. Stucker acted willfully, flagrantly, and maliciously. Such a factual finding would negate any immunity afforded by La. R.S. 13:3715.3; however, because we have found that this was not a peer review process, we do not reach the question of malice.