893 So.2d 32 (2005)
Peter DRISCOLL, M.D.
v.
Fred J. STUCKER, M.D., et al.
No. 2004-C-0589.
Supreme Court of Louisiana.
January 19, 2005.
Rehearing Denied February 25, 2005.
*36 Taylor, Porter, Brooks & Phillips, LLP, Thomas Robert Peak, Baton Rouge, for applicant.
Tutt, Stroud & Bordelon, LLC, Shreveport, Ansel Martin Stroud, III; Law Office of Kent Masterson Brown, Kent Masterson Brown, Pro Hac Vice, Christopher J. Shaughnessy, Pro Hac Vice, for respondent.
KNOLL, Justice.
This case concerns the liability and damages of a medical school and its supervising doctor that improperly causes a medical resident to be ineligible to sit for the board examination in the resident's specialty. More specifically, we are called upon to address the question of whether a medical doctor who successfully completes a residency program in otolaryngology has a property interest in receiving a letter of recommendation from his medical school *37 that is a prerequisite for taking the written examination to make him a specialist in that field of medicine, and whether the decision to grant that letter falls within the concept of peer review immunized in La.Rev.Stat. Ann. § 13:3715.3. In making these determinations, we further address the question of what due process rights must be afforded to an individual when the medical school withdraws its letter of recommendation after the resident completes his course of study and is no longer in the employ of the medical school. Finding no error in the lower courts' analysis of all but one of these difficult and fact-intensive questions, we affirm in all respects except the lower courts' assessment of individual liability to one member of the peer review committee.

FACTS AND PROCEDURAL HISTORY
In 1994, Dr. Peter V. Driscoll (Dr. Driscoll), a 1993 graduate of the Robert Wood Johnson Medical School in New Jersey, entered the Residency Program in Otolaryngology at Louisiana State University Health Sciences Center (LSUHSC) in Shreveport, Louisiana. LSUHSC represented the following to prospective residents in a brochure entitled OTOLARYNGOLOGY HEAD & NECK SURGERY RESIDENCY PROGRAM, LOUISIANA STATE UNIVERSITY MEDICAL CENTER SHREVEPORT:
Each resident is board eligible upon completion of the program. The American Board of Otolaryngology has certified the majority of its residents who have matriculated through the program.
(R. 689-90, Exh. 2).
The LSUHSC Residency Program in Otolaryngology was a six year program: the first year was spent in General Surgery training; the second was a transitional year that entailed rotation through numerous specialties, including otolaryngology; the remaining four years consisted of full time otolaryngology training, each year entailing more responsibilities.
Dr. Fred J. Stucker (Dr. Stucker) was the Program Director and Chairman of the Residency Program in Otolaryngology. There is a close relationship between program schools and the Accreditation Council for Graduate Medical Education (ACGME). In that regard ACGME issues requirements for medical institutions that provide medical education in otolaryngology. Among the responsibilities of the Program Director is "implementing fair procedures, as established by the sponsoring institution, regarding academic discipline and resident complaints and grievances." PROGRAM REQUIREMENTS FOR RESIDENCY EDUCATION IN OTOLARYNGOLGY § III(A)(2)(H) (June 1996).
Despite brief probationary periods during Dr. Driscoll's second and fourth residency years,[1] he successfully remediated his deficiencies to the satisfaction of LSUHSC, and timely completed his six years of residency training at LSUHSC in June 2000.
*38 On June 22, 2000, Dr. Stucker provided Dr. Driscoll his final written evaluation/exit letter as required by the ACGME standards. In addition, Dr. Stucker as Chairman of the Residency Program and Timothy S. Lian, M.D., Program Director of the Residency Program, provided Dr. Driscoll a written recommendation, describing Dr. Driscoll "as a person of high moral character and worthy of examination by the American Board of Otolaryngology." Thus, in keeping with LSUHSC's representations regarding the successful completion of the Residency Program, Dr. Driscoll was "board eligible" and entitled to take the board certification examination of the American Board of Otolaryngology. Pursuant to procedure, Dr. Driscoll forwarded the LSUHSC recommendations to the American Board of Otolaryngology, paid his application fee of $2,250, and applied to take the next board examination in otolaryngology.
Just prior to graduation from LSUHSC, the Minden Medical Center offered Dr. Driscoll a three-year contract position as an otolaryngologist at an annual salary of $360,000. While contemplating this offer, Dr. Driscoll applied for and received temporary medical staff privileges at Minden Medical Center. Staff privileges, however, were only temporarily granted because the medical center requires its staff members to be board eligible in their specialty to maintain staff privileges and participate as active members of its medical staff.
In the first part of August 2000, Kay Carter, a nurse at the V.A. Hospital where Dr. Driscoll provided supervisory duties in otolaryngology during one of his years of residency,[2] told Dr. Stucker that Kevin Williams, a V.A. scrub technician, told her Dr. Driscoll had been performing cosmetic surgery in a closed clinic. Nurse Carter also told Dr. Stucker she had seen dirty LSUHSC equipment trays at the V.A. after weekends, and noticed missing supplies from the V.A. She further told Dr. Stucker of requests to her from Williams and Dr. Driscoll for preoperative narcotics.
Dr. Stucker, who was also aware of missing equipment and surgical staples from LSUHSC, contacted Dr. Driscoll at the Minden Medical Center about Nurse Carter's allegations. After initially denying he performed surgical procedures in the closed LSUHSC clinic, Dr. Driscoll admitted he once performed a closed nasal reduction and removed a lesion over a friend's eye on a weekend, but asserted he had not charged the patient for his services, he had generated a medical chart for the procedure, and he had done no other medical procedures.
On August 9, 2000, Dr. Stucker sent the following letter to Gerald B. Healy, M.D., the Executive Vice-President of the American Board of Otolarygology:
Dear Dr. Healy,
I strongly recommend that you please consider removing Peter Driscoll from the individuals scheduled to sit for the American Board of Otolaryngology. There was a great deal of deliberation before our faculty reluctantly allowed him to complete the residency. Please see the enclosed exit evaluation.
This morning I was informed that Dr. Driscoll engaged in a Private Practice while in training. He used the institutions [sic] facilities and employed a V.A. scrub tech in a University facility on the weekends to perform cosmetic surgical procedures. No departmental or hospital *39 individuals were aware of this (to my knowledge). This is absolutely forbidden by the state and University. There is no question that Dr. Driscoll knew he was violating University rules.
If any additional information is needed, please contact me.
 Sincerely,
 /s/
 Fred J. Stucker, M.D., FACS
Dr. Driscoll was unaware of Dr. Stucker's communication with the American Board of Otolaryngology.[3]
In an August 10, 2000 memo from Dr. Stucker to the LSUHSC faculty regarding Dr. Driscoll, Dr. Stucker asked that they sign the following:
I am aware of the actions taken by Dr. Stucker in reference to Dr. Driscoll's circumstances. Correspondence has been sent to the American Board of Otolaryngology requesting that Dr. Driscoll not be allowed to sit for the boards. See attached letter to ABO. By signing below you acknowledge your awareness and concurrence of these actions.
Dr. Robert Aarstad____________________
Dr. Cherie-Ann Nathan____________________
Dr. Greg Mulcahy____________________
Dr. Timothy Lian____________________
(Emphasis added).
Each faculty member signed Dr. Stucker's memo.
On August 22, 2000, the American Board of Otolaryngology informed Dr. Driscoll by letter that he would not be permitted to sit for the written examination in otolaryngology.[4] The body of the letter reads as follows:
The Credentials Committee of the American Board of Otolaryngology has evaluated your application for the certification examination. Based on the information in that application, additional information received from your Program Director at the School of Medicine in Shreveport, Louisiana, and the fact that we no longer have the required recommendation from your Program Director, we must inform you that your application to take the examination is denied for failure to meet the Board's qualifications for taking the examination.
(Emphasis added).
Realizing he was no longer board eligible, a requirement for staff privileges at the Minden Medical Center, Dr. Driscoll could not accept the offer of employment made to him. Instead, he accepted a one year fellowship in cosmetic surgery in California, earning $12,000 per year from November 2000 to November 2001.
Dr. Driscoll, who had not yet seen Dr. Stucker's letter to Dr. Healy, first attempted to obtain a copy of the letter from the American Board of Otolaryngology; they directed him to talk to Dr. Stucker. Dr. Driscoll then telephoned Dr. Stucker ten to fifteen times to discuss the withdrawal of his earlier recommendation and to obtain a copy of Dr. Stucker's letter to Dr. Healy. Dr. Stucker did not return Dr. Driscoll's calls.
*40 Eventually, Dr. Driscoll hired Gordon Rountree, a Shreveport attorney, to obtain a copy of Dr. Stucker's withdrawal letter and to attempt to address the matter. After Dr. Stucker refused to provide Rountree with a copy of the letter, Rountree met with Dr. Stucker on October 3, 2000, in Dr. Stucker's office. Dr. Stucker refused to provide Rountree with a copy of the letter. Rountree testified Dr. Stucker further said Dr. Driscoll "would not be well served by pursuing this any further" and "the upshot of all of that might be that Dr. Driscoll would lose his license to practice medicine in the state of Louisiana." (R. Vol.IV, 742). Rountree never received a copy of Dr. Stucker's letter.
Dr. Driscoll filed suit against LSUHSC and individually against Dr. Stucker, urging breach of contract and denial of due process claims. On January 6, 2003, the trial court granted partial summary judgment in favor of Dr. Driscoll and against LSUHSC and Dr. Stucker, concluding they denied him procedural and substantive due process of law under Article 1, Section 2, of the Louisiana Constitution, and breached the contract between Dr. Driscoll and LSUHSC; the issue of damages was left for a trial on the merits. After taking evidence, the trial court ruled that Dr. Driscoll was entitled to damages from LSUHSC and Dr. Stucker in the amount of $780,000 in lost wages and $75,000 in general damages, together with interest and court costs.[5] In making this ruling, the trial court found Dr. Stucker acted willfully, flagrantly, and with malice in denying due process to Dr. Driscoll. LSUHSC and Dr. Stucker appealed the judgments of the trial court.
The Court of Appeal, Second Circuit, affirmed the trial court in all respects, but modified the damage award, reducing Dr. Driscoll's lost wages claim to $540,000. Driscoll v. Stucker, 38,133 (La.App. 2 Cir. 2/4/04), 865 So.2d 328. In its affirmation of the trial court's judgment with regard to liability, the appellate court held the immunity afforded by La.Rev.Stat. Ann. § 13:3715.3 was inapplicable to defendants's actions because their actions were not "peer review" within the meaning of the statute. Id. at 333. The reviewing court found Dr. Driscoll possessed a property and liberty interest in receiving the letter of recommendation that made him "board eligible" to take the examination of the American Board of Otolaryngology and that this property interest was subject to due process protections recognized in La. Const. Ann. art. I, § 2. Id. at 334.
The appellate court further found no manifest error in the trial court's holding that there was no credible evidence of wrongdoing on Dr. Driscoll's part, and pointed out Dr. Stucker relied solely upon hearsay evidence. Id. at 335. In so ruling, the appellate court recognized that although Dr. Driscoll admitted performing a simple procedure on one patient on one weekend, LSUHSC produced no written policy that such action was "absolutely forbidden." Id. Furthermore, the reviewing court held that considering defendants' refusal to provide Dr. Driscoll a copy of the letter revoking his recommendation for a two-year period and only after a lawsuit was filed, that resulted in the loss of witnesses, the trial court properly concluded the burden shifted to defendants to prove *41 substantive wrongdoing on the part of Dr. Driscoll and that defendants failed to show such wrongdoing. Id. at 336.
Lastly, the appellate court found no error in the trial court finding Dr. Stucker individually liable because he violated Dr. Driscoll's rights and acted outside the scope of the constitutional and contractual obligations afforded to Dr. Driscoll. In reaching this conclusion, the reviewing court observed the trial court properly rejected Dr. Stucker's assertion that his actions were first approved by in-house counsel, noting that defendants failed to call their in-house counsel to testify to this fact. Id. at 336-37. The reviewing court characterized Dr. Stucker's violation of due process as blatant and intentionally inflicted upon Dr. Driscoll. Id.
We granted LSUHSC and Dr. Stucker's writ application to review the propriety of the lower courts' rulings. Driscoll v. Stucker, 04-0589 (La.5/14/2004), 872 So.2d 527.

LAW AND ANALYSIS
The resolution of the multiple issues raised in this case are primarily fact-driven. We will first address the question of whether Dr. Driscoll had a property interest in the letter of recommendation. We will then assess whether Dr. Driscoll was entitled to due process as a graduated resident of LSUHSC. After a discussion of these threshold issues, we will consider the contention of LSUHSC and Dr. Stucker that they were immune from liability under La.Rev.Stat. Ann. § 13:3715.3. Next, we will examine the trial court's evidentiary rulings, its allocation of the burden of proof and analysis of the evidence adduced regarding Dr. Driscoll's alleged wrongdoings, and the assessment of individual liability to Dr. Stucker. Finally, we will review the lower courts' assessment of damages.

Property interest in the letter of recommendation
Defendants contend Dr. Driscoll did not have a constitutionally sufficient property interest in the mere recommendation that he be allowed to take a written examination, which might, or might not, ultimately result in certification, to entitle him to due process. Dr. Driscoll, on the other hand, contends the lower courts properly determined he possessed a property and liberty interest within the meaning of due process as provided in La. Const. Ann. art. I, § 2. Dr. Driscoll further argues the lower courts also found he had a vested contractual interest in the recommendation that he was worthy of examination by the American Board of Otolaryngology upon his successful completion of LSUHSC's residency program.
The Fourteenth Amendment to the United States Constitution provides, in pertinent part, "nor shall any state deprive any person of life, liberty or property, without due process of law." In addition, La. Const. Ann. art. I, § 2 provides "[n]o person shall be deprived of life, liberty, or property, except by due process of law."
To obtain protection under the due process clause, a person must have more than an abstract need or desire for the liberty or property interest and must have more than a unilateral expectation of the interest; instead, the person must have a legitimate claim of entitlement to the interest. Acadian Ambulance Service v. Parish of East Baton Rouge, 97-2199 (La.App. 1 Cir. 11/6/98), 722 So.2d 317, writ denied, 98-2995 (La.12/9/98), 729 So.2d 583. Existing rules or understandings stemming from independent sources such as state law create and shape what property interests are subject to due process protection under the Fourteenth Amendment. Board of Regents of State *42 Colleges v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Explicit contractual provisions or "other agreements implied from the promissor's words or conduct in light of the surrounding circumstances" may also create property interests. Perry v. Sindermann, 408 U.S. 593, 601-02, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).
As noted in the Second Circuit opinion in the present case:
A number of courts have concluded that medical students and residents possessed "property" and/or "liberty" interests in their positions. In Ewing v. Bd. of Regents of Univ. of Mich., 742 F.2d 913 (6th Cir.1984), reversed on other grounds, 474 U.S. 214, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985), the United States Court of Appeals for the Sixth Circuit concluded that a contractual relationship existed between a medical student and his university and proceeded to hold that an implied understanding that a student shall not be arbitrarily dismissed from his university is a property interest, resting in the contractual relationship between the parties, which can give rise to constitutional protections. Similarly, in Ezekwo v. NYC Health & Hospitals Corp., 940 F.2d 775 (2nd Cir.1991), cert. denied, 502 U.S. 1013, 112 S.Ct. 657, 116 L.Ed.2d 749 (1991), a physician brought an action against a public hospital alleging that her due process rights were violated when she was denied her status as chief resident. One of the issues presented was whether the plaintiff possessed a "property" interest in obtaining the position of chief resident so as to trigger the due process protections of the Fourteenth Amendment to the United States Constitution. The United States Court of Appeals for the Second Circuit concluded that the plaintiff did indeed possess a protectable "property" interest in obtaining the chief resident position based upon the defendant's policies and practices, the defendant's informational materials regarding the residency program, and the plaintiff's reasonable reliance upon these understandings and representations. Ezekwo, supra. Other cases are in accord with the sound principles of Ewing and Ezekwo applying the holding of the United States Supreme Court in Roth. See, e.g., Ong v. Tovey, 552 F.2d 305 (9th Cir.1977) (finding a property interest in surgical residency subject to due process protections); Navato v. Sletten, 560 F.2d 340 (8th Cir.1977) (holding that a physician who was to receive three years of training required for certification in specialty of psychiatry and was then to render two years of service in state mental hospitals possessed property interest in position cognizable under the Fourteenth Amendment); Waliga v. Board of Trustees of Kent State Univ., 22 Ohio St.3d 55, 488 N.E.2d 850 (1986) (a degree holder possesses a property interest in a degree that cannot be taken away except pursuant to constitutionally adequate procedures).
Driscoll, 865 So.2d at 334.
LSUHSC and Dr. Stucker contend their withdrawal of the first recommendation cannot be likened to a degree or a once-issued license. At best, they argue the recommendation constituted a potential prospective enhancement to Dr. Driscoll's resume and opened certain additional employment opportunities. They urge the letter of recommendation was more akin to a prospective promotion. We are not persuaded by this argument.
As a threshold matter, we note LSUHSC and Dr. Stucker argued Dr. Stucker's withdrawal letter only recommended the removal of Dr. Driscoll from *43 the next otolaryngology testing; they contend the decision to remove Dr. Driscoll from the list of prospective testing applicants was not theirs to make and was actually made by the American Board of Otolaryngology. After reviewing Dr. Stucker's August 10, 2000 memo to the faculty, it is definite that Dr. Stucker viewed the withdrawal letter as more than just a recommendation. His letter requested that "Dr. Driscoll not be allowed to sit for the boards." See supra at 38-39. Equally important, the American Board of Otolaryngology interpreted Dr. Stucker's letter as a withdrawal of his recommendation, as can be seen in its August 22, 2000 letter to Dr. Driscoll, stating "we no longer have the required recommendation from your Program Director." Therefore, we find no merit to the argument of LSUHSC and Dr. Stucker in this regard.
It cannot be gainsaid that the letter of recommendation enhanced Dr. Driscoll's credentials and opened employment opportunities that otherwise would not exist. In particular, the letter of recommendation was a primary cause in Dr. Driscoll's enrollment at LSUHSC and was a reasonable expectation of his choice of this residency program. LSUHSC expressly highlighted documents specifically stating that "[e]ach resident is board eligible upon completion of the program." (R., Vol. IV, at 689). More importantly, the ACGME required LSUHSC to issue the final written evaluation and letter of recommendation when Dr. Driscoll successfully completed his course of study.
It is clear the revocation of Dr. Driscoll's letter of recommendation implicated his liberty/property interests. As acknowledged in Dr. Stucker's testimony, the withdrawal of the letter of recommendation would adversely affect Dr. Driscoll's ability to obtain medical staff privileges and the professional options otherwise open to him. The record bears out this is exactly what transpired. Therefore, we find Dr. Driscoll possessed a property and liberty interest within the meaning of due process as provided in La. Const. Ann. art. I, § 2.

Entitlement to due process
LSUHSC and Dr. Stucker argue that even though Dr. Driscoll may have had a property interest in the letter of recommendation, he was no longer entitled to due process because he was neither a resident nor under a contract of employment with LSUHSC. After careful consideration of the record and the various arguments presented, we find Dr. Driscoll was entitled to due process under the facts presented herein.
Due process is an elusive concept. Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960). Its exact boundaries are undefinable, and its content varies according to specific factual contexts. Id. As a generalization, it can be said due process embodies the differing rules of fair play which through the years have become associated with differing types of proceedings. Id.
When coupled with government officials's communications that stigmatize the plaintiff, a claim of deprivation of liberty or property interest without due process will lie where there is a loss, infringement or denial of a government right or benefit previously enjoyed. Roth, 408 U.S. at 573, 92 S.Ct. 2701. Moreover, a liberty interest is implicated triggering procedural due process requirements when the state imposes a stigma or other disability upon the plaintiff that forecloses his freedom to take advantage of other employment opportunities. Id., 408 U.S. at 574-75, 92 S.Ct. 2701. In such instances, the right to some sort of prior hearing is paramount. Id.
*44 In the present case, we find it inconsequential that Dr. Stucker's withdrawal of the letter of recommendation came when Dr. Driscoll was neither a LSUHSC resident nor under current contract of employment with LSUHSC. A benefit need not accrue before a person's employment is completed to constitute a term, condition, or privilege of that employment relationship. Hishon v. King & Spalding, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). See also, e.g., Mallare v. St. Luke's Hospital of Bethlehem, 699 F.Supp. 1127 (E.D.Penn.1988) (holding in a Title VII case that an additional factor relating to employment was the doctor's understanding during his employment as a resident physician in the defendant hospital that he would be granted staff privileges, if he so desired, upon successful completion of the residency program). Applying this body of law to the present case, it is evident the benefit due Dr. Driscoll under his former residency contract with LSUHSC was his future right, after LSUHSC's certification of the successful completion of his residency, to take the otolaryngology test administered by the American Board of Otolaryngology.
A review of the record shows there was a contractual nexus between Dr. Driscoll's participation as a medical resident, his employment at LSUHSC, and his board eligibility to take the specialty examination in otolaryngology at some future time.[6] It is a basic tenet of contract law that parties to an obligation will perform the conditions of the obligation in good faith. La. Civ.Code Ann. art. 1759. Good faith is defined in part in the Sixth Edition of Black's Law Dictionary as "[h]onesty of intention, and freedom from knowledge of circumstances which ought to put the holder upon inquiry." When these factors are considered, it is clear Dr. Driscoll was entitled to receive a letter of recommendation if he complied with the obligations that applied to him. Correlatively, LSUHSC was obliged to properly evaluate performance of the residents and to inquire further if it thought it was necessary to revoke its earlier letter of recommendation. Thus, we find the fair play elements of due process should have governed Dr. Stucker's decision to subsequently withdraw the letter of recommendation.

Peer Review Immunity
LSUHSC and Dr. Stucker first contend they are entitled to immunity from liability for any damages to Dr. Driscoll with respect to their decision to request that Dr. Driscoll not be allowed to sit for the written examination for Board certification in otolaryngology. Their contention is based upon La.Rev.Stat. Ann. § 13:3715.3(C) that provides:
No member of any such committee designated in Subsection A of this Section or any sponsoring entity, organization, or association on whose behalf the committee is conducting its review shall be liable in damages to any person for any action taken or recommendation made within the scope of the functions of such committee if such committee member *45 acts without malice and in the reasonable belief that such action or recommendation is warranted by the facts known to him.
Through its provisions, La.Rev.Stat. Ann. § 13:3715.3(C) is only applicable to peer review committees and other entities while conducting peer review. Such limitation is found in La.Rev.Stat. Ann. § 13:3715.3(A)(1) that provides:
Any public hospital committee, medical organization peer review committee, any nationally recognized improvement agency or commission, including but not limited to the Joint Commission on Accreditation of Healthcare Organizations (JCAHO), or any committee or agency thereof, or any healthcare licensure agency of the Louisiana Department of Health and Hospitals, public hospital board while conducting peer reviews, dental association peer review committee, professional nursing association peer review committee, extended care facility committee, nursing home association peer review committee, peer review committee of a group medical practice of twenty or more physicians, peer review committee of a freestanding surgical center licensed pursuant to R.S. 40:2131 et seq., or health maintenance organization peer review committee, including but not limited to the credentials committee, the medical staff executive committee, the risk management committee, or the quality assurance committee, any committee determining a root cause analysis of a sentinel event, established under the bylaws, rules, or regulations of such organization or institution,....
(Emphasis added).[7]
In addressing defendants' claims of immunity under La.Rev.Stat. Ann. § 13:3715.3, we must first "determine whether the defendants are peer review committee members whose actions on which liability is premised were undertaken as part of the peer review process." Smith v. Our Lady of the Lake Hospital, Inc., 93-2512 (La.7/5/94), 639 So.2d 730, 750.
"Peer review" is the process by which physicians, hospitals and other health care providers review the performance of other physicians and, when warranted, discipline the reviewed physician for incompetence or unprofessional conduct. Smith, 639 So.2d at 735, n. 2. In the present case, the facts are somewhat different from that normally associated with peer review in the medical setting. Unlike Smith where a physician's continued hospital privileges were under review, Dr. Driscoll was neither a practicing physician at LSUHSC nor was he seeking medical staff privileges there. Notwithstanding, we find the actions of LSUHSC and Dr. Stucker were sufficiently akin to that normally associated with peer review because the import of the letter of recommendation was an attestation to the specialized skills Dr. Driscoll possessed to qualify for certification as an Otolaryngologist and his moral character to hold himself out to patients in that capacity. Thus, in essence the committee functioned to review Dr. Driscoll's competence and whether he conducted himself professionally.
Having found defendants were peer review members engaged in peer review, we must next determine whether there was an abuse of the peer review process. Smith, 639 So.2d at 750. La.Rev.Stat. Ann. § 13:3715.3(C) qualifies the immunity from *46 liability by providing that it applies only when the committee member's action or recommendation is taken "without malice," "in the reasonable belief that such action or recommendation is warranted by the facts known to him," and "within the scope of the functions of such committee." La.Rev.Stat. Ann. § 13:3715.3(C).
Addressing the malice aspect of the qualified immunity recognized in La.Rev.Stat. Ann. § 13:3715.3(C), this Court stated:
The two statutory qualifications on the immunity must be read together and surely are not separate and distinct. Our finding is based on the synonymous construction we give the two statutory qualifications-"without malice" and "in the reasonable belief that such action or recommendation is warranted by the facts known to [the committee member]." More particularly, we construe both these qualifications to mean "good faith."
Smith, 639 So.2d at 748.
Commenting further, this Court found that lack of "malice" and "good faith" exists in this context when the defendants-peer review committee is shown to have a reasonable basis for their action or recommendation made in the course of the peer review process. Smith, 639 So.2d at 749.
The trial court concluded Dr. Stucker acted with malice, and intentionally, willfully, and/or flagrantly violated Dr. Driscoll's due process rights. In reaching this conclusion, the trial court reviewed the facts known to Dr. Stucker and the manner in which he revoked the letter of recommendation.
In civil cases, the appropriate standard for appellate review of factual determinations is the manifest error-clearly wrong standard, which precludes the setting aside of a district court's finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. Cenac v. Public Access Water Rights Ass'n, 2002-2660 (La.6/27/03),851 So.2d 1006, 1023. Thus, a reviewing court may not merely decide if it would have found the facts of the case differently. Id. The reviewing court should affirm the district court where the district court judgment is not clearly wrong or manifestly erroneous. Id., 851 So.2d at 1023.
One of the basic tenets of the manifest error standard of review is that "reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the court of appeal is convinced that had it been the trier of fact, it would have weighed the evidence differently." Parish Nat. Bank v. Ott, XXXX-XXXX (La.2/25/03), 841 So.2d 749, 753. This principle is further explained in Ott as follows:
This court has announced a two-part test for the reversal of the factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong but whether the factfinder's conclusion was a reasonable one.... The reviewing court must always keep in mind that if the trial court's findings are reasonable in light of the record reviewed in its entirety, the appellate court may not reverse, even if convinced that had it been sitting as trier of fact, it would have weighed the evidence differently.
Id. 841 So.2d at 753-54, quoting Stobart v. State Through DOTD, 617 So.2d 880 (La.1993).
*47 LSUHSC and Dr. Stucker contend the trial court was manifestly erroneous because the testimony was unrefuted that Dr. Stucker sought the advice of Mickey Prestridge, an in-house LSUHSC attorney who was not called to testify at trial, before they took action adverse to Dr. Driscoll. They urge the trial court erroneously applied an adverse presumption rule with regard to Prestridge, arguing he was equally available to Dr. Driscoll.
An adverse presumption exists when a party having control of a favorable witness fails to call him or her to testify, even though the presumption is rebuttable and is tempered by the fact that a party need only put on enough evidence to prove the case. Safety Ass'n of Timbermen Self Insurers Fund v. Malone Lumber, Inc., 34,646 (La.App.2 Cir.6/20/01), 793 So.2d 218, writ denied, 2001-2557 (La.12/07/01), 803 So.2d 973. Explaining that adverse presumption, the Fourth Circuit recently noted "`[w]hen a defendant in a civil case can by his own testimony throw light upon matters at issue, necessary to his defense and particularly within his own knowledge, and fails to go upon the witness stand, the presumption is raised and will be given effect, that the facts, as he would have them do not exist.'" Taylor v. Entergy Corp., XXXX-XXXX (La.App. 4 Cir. 4/17/02), 816 So.2d 933 (quoting Davis v. Myers, 427 So.2d 648, 649 (La.App. 5 Cir.1983)). This adverse presumption is referred to as the "uncalled witness" rule and applies "when `a party has the power to produce witnesses whose testimony would elucidate the transaction or occurrence' and fails to call such witnesses." Id. (quoting 19 FRANK L. MARAIST, LOUISIANA CIVIL LAW TREATISE: EVIDENCE AND PROOF, § 4.3 (1999)). Despite the advent of modern, liberal discovery rules, this rule remains vital, especially in cases, such as this one, in which a witness with peculiar knowledge of the material facts is not called to testify at trial.
In the present case, although Prestridge may have been equally available to the parties, it is nonetheless evident his testimony was only favorable to LSUHSC and Dr. Stucker, not Dr. Driscoll. It was thus incumbent upon LSUHSC and Dr. Stucker to present Prestridge's testimony, not Dr. Driscoll, to prove their assertion that Dr. Stucker acted on Prestridge's legal advice. Thus, we find the trial court properly invoked the uncalled witness rule.
LSUHSC and Dr. Stucker further argue that no evidence was adduced to refute their assertion that prior to the issuance of the letter withdrawing Dr. Driscoll's recommendation, Dr. Stucker consulted with Dr. Roy Clay, the Chief of Clinical Services, Dr. John McDonald, the Chancellor, as well as the entire Otolaryngology faculty.[8] Assuming arguendo the correctness of that assertion, we nonetheless find the record as a whole provides a reasonable basis for the trial court's conclusion of this matter. We find it was well within the trial court's purview to accept the consultation evidence and yet reach the conclusion it did adverse to LSUHSC and Dr. *48 Stucker. The reviewing court must always keep in mind the reasonableness of the trial court's findings are reviewed in light of the record in its entirety. Stobart v. State Through DOTD, 617 So.2d 880 (La.1993).
The trial court heard testimony that despite numerous telephone calls from Dr. Driscoll, Dr. Stucker repeatedly refused to even provide Dr. Driscoll with a copy of the letter withdrawing the recommendation essential to being allowed to take the otolaryngology examination. When Dr. Driscoll's attorney, Gordon Rountree, met with Dr. Stucker to facilitate production of a copy of the letter, Dr. Stucker threatened Dr. Driscoll with further action. Rountree's undisputed testimony was:
[A]fter we discussed that for a while, he [Stucker] advised me that Dr. Driscoll would not be well served by pursuing this any further, because if a lawsuit were filed, that it would be defended vigorously, and the upshot of all of that might be that Dr. Driscoll would lose his license to practice medicine in the state of Louisiana.
(R., Vol.IV, 742).
Moreover, it is an uncontested fact that LSUHSC and Dr. Stucker provided no avenue for Dr. Driscoll to dispute the assertions of Dr. Stucker's August 9 letter. Although Dr. Stucker's actions in this regard occurred after Dr. Driscoll matriculated, as we found supra, there was a close connection between that letter, Dr. Driscoll's residency, and LSUHSC's obligations to Dr. Driscoll to provide a letter of recommendation to those who successfully completed their residency training. Dr. Stucker neither communicated this post-matriculation evaluation to Dr. Driscoll nor made the withdrawal letter accessible to him or his attorney.
We further find the testimony of Dr. Robert Aarstad, an associate professor in the Department of Otolaryngology, telling in several respects. Dr. Aarstad testified he was aware of the basic concepts of due process, i.e., the right to a hearing, to confront witnesses, and present your side of the case. He was unaware of whether Dr. Driscoll was notified and advised of the allegations made against him. He further opined that it probably would have been appropriate to provide Dr. Driscoll with a copy of the letter revoking the prior recommendation. When we compare Dr. Aarstad's appreciation of the evidence against Dr. Driscoll, we find it far more embellished than that provided by Nurse Carter to Dr. Stucker.
When these facts are considered in toto and compared to Dr. Driscoll's admission that he performed a closed nasal reduction and removed a lesion over a friend's eye on a weekend, we cannot say the trial court was manifestly erroneous in its conclusion that the qualified immunity provided to those conducting peer review was inapplicable because Dr. Stucker blatantly violated Dr. Driscoll's due process rights and his actions were intentional, willful, and malicious.
Moreover, as defined in La.Rev.Stat. Ann. § 13:3715.3(A)(1) the immunity provided in La.Rev.Stat. Ann. § 13:3715.3(C) extends only to "any committee determining a root cause analysis of a sentinel event, established under the bylaws, rules, or regulations of such organization or institution." (Emphasis added). In the present case, the record is void of any evidence that LSUHSC presented any bylaw, rule or regulation of the institution that Dr. Driscoll supposedly violated.
In summation, under the facts presented to the trial court, we find the actions of LSUHSC and Dr. Stucker do not *49 fall within the qualified immunity recognized in La.Rev.Stat. Ann. § 13:3715.3 because their actions were not made in good faith and they failed to produce evidence of any bylaw, rule or regulation of the institution that Dr. Driscoll violated.

Hearsay Evidence
As capsulized in the recitation of facts offered from LSUHSC and Dr. Stucker:
In early August 2000, after Dr. Driscoll's completion of his residency, Kay Carter, a nurse at the V.A. Hospital (not employed by LSUHSC) told Dr. Stucker that Kevin Williams (a scrub tech at the V. A., also not employed by LSUHSC) had told her that Dr. Driscoll, with Mr. Williams' assistance, had been performing cosmetic surgical procedures in a closed clinic (while Dr. Driscoll was a resident, but outside his employment and duties). Mr. Williams also told Sgt. Donald Johnson (another V.A. coworker) the same thing, telling both Ms. Carter and Sgt. Johnson that Dr. Driscoll was collecting fees for those procedure and paying Williams for his assistance.
Brief for Relator at 3.
We will separately assess the evidentiary rulings as they relate to Williams and Johnson.
LSUHSC and Dr. Stucker first contend Williams's statements to Carter were statements against interest by an unavailable witness and were therefore admissible as an exception to the hearsay rule. Alternatively, they argue that despite the hearsay nature of these statements, they were nonetheless relevant to the issue of whether Dr. Stucker's actions were reasonable and would have been admissible at any due process hearing because the strict rules of evidence would have been inapplicable as provided in the LSUHSC House Staff Manual.[9]
Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La.Code Evid. Ann. art. 801(C). Hearsay is not admissible except as otherwise provided by the Code of Evidence or other legislation. La.Code Evid. Ann. art. 802.
Without disagreeing with the hearsay characterization of her testimony, LSUHSC and Dr. Stucker argue Williams's statements to Carter were admissible statements against interest. As such they contend these statements were an exception to the hearsay rule under La.Code Evid. Ann. art. 804(B)(3) that provides, in pertinent part:
The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
* * *
(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true.
La.Code Evid. Ann. art. 804(A) further provides, "a declarant is `unavailable as a witness' when the declarant cannot or will not appear in court and testify to the substance of his statement made outside court." This includes situations in which the declarant:

*50 (5) Is absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means. A declarant is not unavailable as a witness if his exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of his statement for the purpose of preventing the witness from attending or testifying.
La.Code Evid. Ann. art. 804(A)(5).
Genuine unavailability of a witness is the jurisprudential requirement to obviate constitutional confrontation problems. State v. Robinson, 423 So.2d 1053 (La.1982). Furthermore, a witness is not unavailable for purposes of the exception to the confrontation requirement unless the authorities have made a diligent and good faith effort to obtain his presence at trial. Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); State v. Sam, 283 So.2d 81 (La.1973), affirmed, 304 So.2d 659 (La.1974).
In the present case, LSUHSC and Dr. Stucker merely assert Williams was unavailable to testify.[10] There is no showing in the record to indicate they made any effort, much less a diligent and good faith effort, to obtain his presence at trial. Thus, they have failed to show they may avail themselves of this exception to the hearsay rule.
LSUHSC and Dr. Stucker next contend these statements would have been admissible at an administrative hearing had one been provided to Dr. Driscoll. It is well accepted hearsay evidence may be admissible in administrative hearings. Superior Bar & Grill, Inc. v. State, Through Dept. of Public Safety and Corrections, Louisiana State Police Video Gamin Div., 94-1879 (La.App. 1 Cir. 5/5/95), 655 So.2d 468. Because LSUHSC and Dr. Stucker unduly protracted this matter for over two years and thereby heightened the likelihood of Williams's unavailability, they have denied Dr. Driscoll the opportunity to cross-examine this alleged accuser. Under these circumstances, we find their reliance on this hearsay testimony unreasonable. Accordingly, we find no error in the trial court's exclusion of Williams's hearsay testimony.
We likewise find no error in the trial court's exclusion of Johnson's hearsay testimony. In addition to the above-recited hearsay analysis, we further find a temporal justification for the trial court's ruling. Although Johnson may have been able to corroborate Nurse Carter's hearsay testimony, Johnson did not approach Dr. Stucker for more than a year after Dr. Stucker withdrew Dr. Driscoll's letter of recommendation. Thus, it is clear Johnson's proffered testimony could not have entered into Dr. Stucker's decision-making conducted a year earlier.

Burden of Proof
LSUHSC and Dr. Stucker next argue the trial court erred in shifting the burden of proof to them. Their argument is twofold: First, they contend no shifting of the burden of proof should have occurred because Dr. Driscoll failed to prove they acted with malice or lack of good faith. Secondly, if the burden did properly shift to them, they contend the trial court prevented them from proving they would have taken the same action had a due process hearing been afforded because they were not permitted to present the hearsay testimony of Carter and Johnson.
*51 As a matter of background and in an attempt to place this argument into a legal context, we observe that in Carey v. Piphus, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), the United States Supreme Court recognized that even if a plaintiff can establish a due process violation, nominal damages only would be appropriate if the defendant could demonstrate the effect on the plaintiff would have been the same even if notice and a hearing had been afforded. However, other Supreme Court jurisprudence also recognized that the burden shifts to the defendant only after the plaintiff establishes a constitutional violation. Mt. Health City Sch. Dist. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); see also McClure v. Independent School District No. 16, 228 F.3d 1205, 1212, 1213 (10 Cir.2000).
Arguing that the trial court manifestly erred in finding Dr. Driscoll carried his burden of proving a constitutional violation, LSUHSC and Dr. Stucker argue the burden never shifted to them. In particular, they focus on the trial court's conclusion that Dr. Stucker acted with malice, and intentionally, willfully, and/or flagrantly violated Dr. Driscoll's due process rights. Having earlier found no manifest error in the trial court's conclusion in this regard, we proceed to the next argument of LSUHSC and Dr. Stucker.
LSUHSC and Dr. Stucker next contend the trial court prevented them from proving they would have taken the same action had a due process hearing been afforded because they were not permitted to present the hearsay testimony of Carter and Johnson.
In an earlier section of this opinion, we disposed of the hearsay exceptions LSUHSC and Dr. Stucker raised, finding the hearsay testimony of Carter and Johnson, both of which relied upon statements Williams purportedly made to them, properly excluded by the trial court. Although hearsay may be admissible in administrative hearings, the findings of an administrative body must nonetheless be supported by competent evidence. Taylor v. New Orleans Police Dept., XXXX-XXXX (La.App. 4 Cir. 12/12/01), 804 So.2d 769.
In the present case, the non-hearsay evidence can be briefly summarized. Nurse Carter told Dr. Stucker she had seen dirty LSUHSC equipment trays at the V.A. after weekends, and noticed missing supplies from the V.A. She further told Dr. Stucker of requests from Williams and Dr. Driscoll to her for preoperative narcotics. Dr. Stucker was also aware of missing equipment and surgical staples from LSUHSC.
In addition, Dr. Driscoll admitted to Dr. Stucker he performed a closed nasal reduction and removed a lesion over a friend's eye on one patient on one occasion, the patient was a friend, and he did not charge the patient. Dr. Driscoll further testified he knew of similar procedures done by others on the weekend. Along that line of testimony, Dr. David Hilton, a part-time attending physician at LSUHSC while Dr. Driscoll was a resident, further testified that performing minor procedures in the clinic over a weekend, such as that done by Dr. Driscoll on this one occasion, was acceptable, not unusual, and that he would not find such conduct to be an issue.
When this non-hearsay evidence is considered, we find LSUHSC and Dr. Stucker failed to present competent evidence to prove wrongdoing on Dr. Driscoll's part. Simply stated, they did not carry their burden of proving with competent evidence that they would have taken the same action against Dr. Driscoll even if he had *52 been provided a hearing and an opportunity to be heard. In making this determination, we do not imply that LSUHSC could not have disciplined Dr. Driscoll for the alleged wrongdoings. However, it is the manner in which LSUHSC handled the allegations of wrongdoing without affording due process to Dr. Driscoll that caused the legal ramifications.

Dr. Stucker's Individual Liability
LSUHSC and Dr. Stucker next contend the trial court erred when it found Dr. Stucker individually liable. They argue all of Dr. Stucker's interactions with Dr. Driscoll and the American Board of Otolaryngology were in his official capacity as Chairman of the Department of Otolaryngology and his actions were taken only after consultation with the LSUHSC faculty, his supervisors, and in-house counsel.
Personal or individual capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law causing the deprivation of a constitutional right. A state official is individually liable for violating the constitutional rights of his victim. Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Kentucky v. Graham, 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); see also, Hafer v. Melo, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Although the State of Louisiana has extended indemnification to its officials accused of violating a plaintiffs' constitutional rights, this does not alter the individual's primary liability.[11]Anderson v. Phelps, 655 F.Supp. 560 (M.D.La.1985); Muhammed v. Bd. of Sup'rs of Southern University, 715 F.Supp. 732 (M.D.La.1989), affirmed, 9 F.3d 104 (5 Cir.1993).
As stated above, Dr. Driscoll had a property, liberty, and contractual interest in receiving board eligibility status that due process principles clearly protected. Notwithstanding, the evidence shows Dr. Stucker's interactions with Dr. Driscoll and with the American Board of Otolaryngology were solely in his capacity as Chairman of LSUHSC's Department of Otolaryngology. As further evidenced by Dr. Stucker's August 10, 2000, memo to the LSUHSC faculty, he obtained faculty approval, as well as that of his superiors, Dr. Clay and Dr. McDonald, before he asked the American Board of Otolaryngology to "consider removing Peter Driscoll from the individuals scheduled to sit for the American Board of Otolaryngology." Clearly, Dr. Stucker did not act alone before proceeding to take further action with the American Board of Otolaryngology. Therefore, under these facts, we find the trial court erred in finding Dr. Stucker individually liable.

Damages: Loss of Wages
LSUHSC and Dr. Stucker contend the record does not support the appellate court's conclusion they should be responsible for Dr. Driscoll's loss of employment at the Minden Medical Center.[12] Their argument is twofold: First, they contend Dr. Driscoll was only inclined to accept the offer from the Minden Medical Center. Secondly, they argue Dr. Driscoll failed to *53 mitigate his damages by not even attempting to seek temporary staff privileges.
The trial court is accorded broad discretion in assessing awards for lost earnings, but there must be a factual basis in the record for the award. Quinn v. Wal-Mart Stores, Inc., 34,280 (La.App.2 Cir.12/06/00), 774 So.2d 1093, writ denied, 01-0026 (La.3/9/01), 786 So.2d 735. A plaintiff bears the burden of proving his claim for lost earnings. Collins v. Shelter Mutual Ins. Co., 36,528 (La.App.2 Cir.12/11/02), 833 So.2d 1166, writ denied, 03-0124 (La.03/24/03), 840 So.2d 539. For purposes of determining damages, the amount of lost earnings need not be proved with mathematical certainty, but by such proof as reasonably establishes the claim, and such proof may consist only of the plaintiff's own testimony. Jordan v. Travelers Ins. Co., 257 La. 995, 245 So.2d 151 (1971); Bruce v. State Farm Ins. Co., 37,704 (La. App.2 Cir 10/29/03), 859 So.2d 296; Clark v. Ark-La-Tex Auction, Inc., 593 So.2d 870 (La.App. 2 Cir.1992), writ denied, 596 So.2d 210 (La.1992). Reasonable certainty is the standard. Finley v. Bass, 478 So.2d 608 (La.App. 2 Cir.1985).
Taking the assertions of LSUHSC and Dr. Stucker in reverse order, we find no evidence to preponderate that Dr. Driscoll failed to mitigate his damages by not seeking temporary staff privileges until there was a resolution of his board eligibility. The evidence is uncontradicted and Dr. Stucker agreed that all hospitals in the Shreveport area required a physician to be board eligible to become a member of the staff. In addition, defense counsel agreed not to enter various hospital bylaws into the record, recognizing that these hospital bylaws require board eligibility to obtain staff privileges as a minimum requirement. At the time Dr. Stucker revoked his letter of recommendation, Dr. Driscoll had temporary staff privileges at the Minden Medical Clinic only because he was board eligible at that time. Thus, we find no factual support for this argument.
As to the first contention of LSUHSC and Dr. Stucker, the record shows Dr. Driscoll forthrightly answered that he was contemplating the offer of the Minden Medical Center to practice otolaryngology for three years at an annual salary of $360,000. LSUHSC and Dr. Stucker neither offered other evidence that this offer was not tendered nor refuted the testimony that Dr. Driscoll offered from William T. Baldwin, Ph.D., an expert economist, that used that offer as one of the elements for his calculations.
Baldwin testified his estimation of Dr. Driscoll's loss of wages amounted to $1,363,346. He based his calculation on his understanding that Dr. Driscoll's ultimate professional goal was certification as a plastic surgeon. For Dr. Driscoll to obtain that certification, he had to first become board certified in otolaryngology. When LSUHSC and Dr. Stucker withdrew the recommendation, their action foreclosed that possibility and lengthened the time Dr. Driscoll could resume that career goal.
Faced with this evidence, the trial court evaluated the lay and expert testimony, lessened the amount of lost wages because Dr. Driscoll still had a Louisiana license to practice medicine and could have earned money in that profession, and awarded lost wages of $780,000. On appellate review, the reviewing court reduced the trial court's award, finding Dr. Driscoll's one year fellowship in plastic surgery (between November 2000 and November 2001) mitigated his damages for that period because this aided him in reaching his ultimate professional goal as a plastic surgeon. However, it found from December 2001, when Dr. Driscoll's fellowship ended, and May 30, 2003, when LSUHSC re-certified him as board eligible to take the examination *54 in otolaryngology, he was entitled to damages for lost wages of $540,000.
After carefully reviewing the record, we find no manifest error in the appellate court's analysis. Having a range of damages from which to choose, its assessment of $540,000 for loss of wages is reasonable and no abuse of discretion is discerned.

DECREE
For the foregoing reasons, we reverse the lower courts' judgments as to the individual liability of Dr. Stucker. In all other respects, we affirm the judgments of the Court of Appeal, Second Circuit, and the First Judicial District Court.
AFFIRMED IN PART; REVERSED IN PART.
JOHNSON, VICTORY and TRAYLOR, JJ., dissent.
NOTES
[1] Dr. Driscoll was placed on probation in his fourth year of residency to improve his patient management skills. On query from the trial court, Dr. Driscoll described patient management skills as follows:

[W]hen a patient comes in with a chief complaint, and you're formulating a differential diagnosis, after you've examined them. Basically, it's ... an outline as to how to obtain the true diagnosis and treatment. And they felt that I was not focused in that regard, that I was looking for other problems that ... was not part of the patient's chief complaint, ...."
(R. at Vol. IV, 693-94).
It cannot be conclusively determined from the record why Dr. Driscoll was on probation in his second year of residency.
[2] LSUHSC's clinical program in Otolaryngology is affiliated with the Overton Brooks Veteran Administration Hospital in Shreveport.
[3] As will be discussed infra, Dr. Stucker did not send a copy of this letter to Dr. Driscoll. LSUHSC and Dr. Stucker did not provide a copy of this letter for an additional two years, and then only after this lawsuit and a motion for preliminary injunction was filed.
[4] There is no indication on the letter that a copy of it was sent to LSUHSC or Dr. Stucker.
[5] In an effort to mitigate damages, the parties also entered into a consent judgment on the issuance of a letter of recommendation for Dr. Driscoll to sit for the American Board of Otolaryngology. On May 12, 2003, the Department of Otolaryngology of the L.S.U. School of Medicine in Shreveport withdrew its letter of August 9, 2000, thereby reinstating its original recommendation through Dr. Stucker that Dr. Driscoll be allowed to sit for the American Board of Otolaryngology.
[6] In many ways, this scenario is not unlike those situations presented to us when we are called upon to determine a law school graduate's eligibility to take the state bar examination. Many times a candidate's bar examination certification is withdrawn, sometimes just before examination dates, because of questions of character and fitness that did not come to light at an earlier time. In those instances where we allow a candidate to conditionally sit for the examination and that person successfully passes the examination, we appoint a commissioner to conduct a character and fitness hearing where all parties involved can present evidence. Only after considering the commissioner's report do we then decide whether the candidate should or should not be admitted to the practice of law.
[7] Neither the statute nor the jurisprudence sheds light on what constitutes a "root cause analysis" or "a sentinel event."
[8] Neither Dr. Clay nor Dr. McDonald testified. The only faculty member to testify was Dr. Robert Aarstad. The parties stipulated that if Dr. Cherie-Ann Nathan and Dr. Timothy Lian were called to testify:

They would testify that they, as a body, decided that the appropriate action was to send the letter to Gerald Healy requesting that he be removed from the list of people scheduled to sit, that this was done before Dr. Stucker sent the letter to Dr. Healy, and that they all signed off on [the memo of August 10, 2000], which memorializes that they ratify that action.
(R., Vol. IV, 872).
Dr. Lian would further testify that he was present when Nurse Carter volunteered her information to Dr. Stucker.
[9] The LSUHSC House Staff Manual provides: "The appeals process is an administrative one, and therefore the strict rules of evidence do not apply." (Exhibit 5, at 5).
[10] During cross-examination Dr. Stucker opined he thought Williams was either in Florida or Virginia in the Air Force.
[11] La.Rev.Stat. Ann. § 13:5801.1(A)(1) provides:

The state shall defend and indemnify a covered individual against any claim, demand, suit, complaint or petition seeking damages filed in any court over alleged negligence or other act by the individual, including any demand under any federal statute when the act that forms the basis of the cause of action took place while the individual was engaged in the performance of the duties of the individual's office or employment with the state.
[12] LSUHSC and Dr. Stucker did not contest the trial court's $75,000 general damage award.