NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-838

CINDY H. SUMNERS

VERSUS

BROOKSHIRE FOOD STORES LOUISIANA, INC.

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 88409-K
HONORABLE PATRICK LOUIS MICHOT, DISTRICT JUDGE

**********

JOHN D. SAUNDERS
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and Phyllis M. Keaty, Judges.

AFFIRMED.

Andrew Holleman Meyers
Beaud & Meyers
P. O. Box 3448
Lafayette, LA 70502
(337) 266-2200
Counsel for Defendant Appellee:
Brookshire Food Stores Louisiana, Inc.

Kraig Thomas Strenge
Attorney at Law
P.O. Box 52292
Lafayette, LA 70502-2292
(337) 261-9722
Counsel for Plaintiff Appellant:
Cindy H. Sumners

**SAUNDERS, Judge.**

This is a case of a patron falling on a rug/floor mat while shopping at a grocery store. The patron filed suit against the grocery store alleging that the rug/floor mat created an unreasonable risk of harm and that it caused her injuries.

A jury found that the rug/floor mat did not create an unreasonable risk of harm, and dismissed the patron's claims. The trial court then taxed all costs of the proceedings to the patron. The patron has appealed. We affirm.

**FACTS AND PROCEDURAL HISTORY:**

On December 5, 2007, Cindy H. Sumners (Sumners) was shopping at Super 1 Foods (Super 1) in Abbeville, Louisiana. Super 1 is a grocery store owned by defendant, Brookshire Grocery Company (Brookshire). On that date, Sumners fell on a floor mat located in the produce section of the store with an allegedly misshapen or stretched rubber border. On March 26, 2008, Sumners filed suit against Brookshire alleging that the eventual amputation of her lower leg was due to injuries she sustained in the fall. Brookshire denied liability via answer filed on April 30, 2008, and also requested a jury trial.

Trial began on October 26, 2009. The jury returned with a verdict that the rug/floor mat did not present an unreasonable risk of harm. Thus, Sumners' claim was dismissed via judgment signed on November 10, 2009, with Sumners being taxed all costs of the proceedings. Sumners appealed, raising the following assignments of error:

**ASSIGNMENTS OF ERROR:**

1. The jury's verdict was not supported by credible eyewitness testimony and/or factual evidence.

2. The jury's verdict finding the area rug and/or floor mat did not pose an unreasonable risk of harm constituted an abuse of discretion and/or manifest error.

3.     The trial court abused its discretion in taxing Sumners with all costs herein.

**ASSIGNMENT OF ERROR NUMBERS ONE AND TWO:**

Sumners alleges in her first assignment of error that the jury's verdict was not supported by credible eyewitness testimony and/or factual evidence. Sumners next claims that the jury's verdict finding that the rug/floor mat did not pose an unreasonable risk of harm constituted an abuse of discretion and/or manifest error. These two assignments of error can be combined as Sumners' claim that the jury's verdict was not supported by credible eyewitness testimony is simply an argument that the jury erroneously found that the rug/floor mat did not present an unreasonable risk of harm. Moreover, in brief, Sumners argued both assignments of error simultaneously, and both are subject to the same standard of review. Accordingly, we will address both under the same heading.

> In applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Where there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong. Thus, if the [factfinder's] findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.

*Gradney v. La. Commercial Laundry*, 09-1465, pp. 2-3 (La.App. 3 Cir. 5/12/10), 38 So.3d 1115, 1118 (citations omitted) (internal quotation marks omitted).

The testimony in the case before us is in conflict regarding the condition of the rug/floor mat that Sumners alleged caused her to fall. Sumners testified as to its condition as follows:

2

Q       Now, after the accident[,] did you take a good look at the rug?

A       Yes.

Q       Tell me what you saw with that rug?

A       Well, the only way I can explain the rug, it was very worn.  I would say something like elastic, like if you wash it too much it wears out, how - - you know how - - it's not - - it's - - or leather that was heated up too much.  You understand what I'm saying?  It's kind of - - it's hard - -

Q       I need you to take your time.

A       I am. I'm just breathing hard.  I'm nervous.

Q       Take a breath and describe, as best you can, what you saw.

A       It was kind of like rippled, it what I'm saying.  Like, you take an elastic like a waistband, elastic - -

Q       Elastic.

A       - - thank you, and you put it like this (indicating).

Q       Calm down.

A       I know.   And you pull it like this and go back; can you understand?

Q       Wavy?

A       Wavy, sort of like ripples in it.

Sumners' testimony regarding the condition of the rug is in direct conflict with the testimonies of Lona Romero, Teri Huval, and Shane Hargrave, all Super 1 employees.  Romero, a cashier working at Super 1 who went to the scene of the fall

just after it occurred, testified as follows (emphasis added):

Q      Did you at any point inspect the rug while Ms. Lolita and Ms. Sumners and everybody was there in the produce department?

A      When I got there the first time I did.

Q      And tell me what you did.

A      When I got to the area[,] I checked it out because I saw she was down so that I could pass to go and see to help her. I didn't want to bump into anything or fall myself. So I went over to her and she asked me to help her, that her knee hurt her, that she had fallen. And I asked her to wait, that I would go and get some help because I couldn't pull her up. *There was nothing wrong with the rug.* I saw the rug when I passed, because I had to cross it to get to her.

Q      Did you do a detailed inspection, or did you just look at it to see if it was flipped over or something like that?

A      I consider it detailed because I was also checking to see if there was water or any vegetables or anything on the floor where I could have slipped, or she slipped or whatever, at the time.

Q      I guess I'm putting you on the spot here a little bit. Did you do a detailed examination of the rubber edging all the way around the rug to make sure that there wasn't any part of the rug that might have been raised off the floor or not lying flat?

A      I looked at it. *It was flat*, so I knew I could pass, you know, over it. Because at my age, I have to be careful, also, so I was being careful that I could cross and that everything was flat and straight like it was supposed to be.

Romero's testimony is corroborated by that of Hargrave, a Super 1 employee who had just left the produce area where the fall took place less than an hour prior. He testified to the following regarding the rug/floor mat's condition (emphasis added):

4

Q     Going back to December 5, 2007, I'm kind of cutting to the chase, but were you at the store at the time that Ms. Sumners fell?

A     No, sir.

Q     Do you know about how long you had maybe worked or been at the store that day?

A     I left about 11:00, 11:15, in that time range.

Q     Was that the end of your particular shift?

A     Yes, sir.

Q     Now, before you left the store that day on your shift, did you perform any inspections?

A     Yes, sir.

Q     And tell me what you did.

A     Pretty basic routine, check for anything on the floor, check for any plastic bags, any mats that's messed up, straighten, make sure nothing's on the floor, pretty safety routine that we do every - - about every hour that I do it.

Q     Okay.  Now, as part of that inspection that day, did you take - - did you inspect the rugs?

A     Yeah, that's part of my job.

Q     Okay.  And can you describe the condition of the rugs that day?

A     *Excellent, nothing was wrong with them.*

Q     Were the rugs flat on the floor?

A     Yes, sir.

5

Q     Did you notice any of the rugs that may have had a misshapen or stretched border on the rubber to the rugs?

A     No. I would have noticed that I would have pulled it off.

Sumners argues that the testimonies of Romero and Hargrave should be disregarded in favor of hers because neither Romero nor Hargrave had personal knowledge of the rug/floor mat's condition at the time of the accident. This argument is tenuous at best.

Hargrave testified as to the condition of all of the rug/floor mats in the produce department less than an hour prior to the accident, while Romero testified as to the specific rug/floor mat's condition directly after the accident. Sumners, herself, did not know the condition of the rug/floor mat "at the time of the accident," as she testified that she was looking up at two green vegetables when she fell rather than looking down at the rug as she tripped. Moreover, Romero's inspection of the rug/floor mat took place within minutes of Sumners' fall.

This is simply a case of two witnesses having different descriptions of an item alleged to be unreasonably dangerous. The jury's decision to find that the rug/floor mat was not unreasonably dangerous is reasonable given Romero and Hargrave's testimonies. While Sumners testified as to a different condition of the rug/floor mat, "[w]here there are two permissible views of the evidence, a factfinder's choice between them can never be manifestly erroneous or clearly wrong." *Gradney*, 38 So.3d at 1118. Thus, the jury's finding that the rug/floor mat that allegedly caused Sumners to fall was not unreasonably dangerous was not manifestly erroneous.

Sumners calls attention several times in brief to Brookshire's failure to call as a witness Lona Guidry, a former Super 1 employee who was the store manager at the

6

time of the fall and who created an accident report about the fall. Sumners suggests that this court should apply the "uncalled witness rule" to create a presumption that Guidry would have given testimony that was adverse to Brookshire's position. *See Driscoll v. Stucker*, 04-589 (La. 1/19/05), 893 So.2d 32. We decline to do so.

It was Sumners who had the burden to prove at trial that the rug/floor mat was unreasonably dangerous. If she believed that Guidry would help in that endeavor, Romero was subpoenaed as a witness for the trial, and Sumners had the same opportunity to call Guidry as a witness as Brookshire. Moreover, this presumption "is tempered by the fact that a party need only put on enough evidence to prove [or defend] the case." *Bartley v. Fondren*, 43,779, p. 6 (La.App. 2 Cir. 12/3/08), 999 So.2d 146, 149-50, *citing Driscoll v. Stucker*, 893 So.2d 32. Given the testimonies above of both Romero and Hargrave, it is clear that Brookshire reasonably believed that it had sufficiently defended its position that the rug/floor mat was not unreasonably dangerous.

**ASSIGNMENT OF ERROR NUMBER THREE:**

In her final assignment of error, Sumners contends that the trial court abused its discretion in taxing Sumners with all costs herein. We find no credence in this contention.

> The trial court, in taxing court costs, is given great discretion and may assess those costs in any manner it deems equitable. La.Code Civ.P. art. 1920. The standard of reviewing assessment of court costs is abuse of discretion. *Trahan v. Asphalt Associates, Inc.*, 01-311 (La.App. 3 Cir. 10/17/01), 800 So.2d 18

*Bentley v. Fanguy*, 09-822, pp.10-11 (La.App. 3 Cir. 10/6/10), 48 So.3d 381, 389.

Sumners argues that the trial court should have taxed some of the court costs

7

at the trial level to Super 1 because the jury's verdict was not unanimous and because some evidence that could have made the trying of Sumners' case easier was lost solely due to Brookshire's actions. Generally, if a party completely succeeds in its position, as Brookshire did here, the losing party pays court costs. Here, the trial court followed that generality. As such, we find no abuse of the considerable leeway given to a trial court in taxing court costs. Thus, we find this argument lacks merit.

Sumners next argues that this court, should it uphold the jury's findings, tax some costs of these proceedings to Brookshire, as it needlessly entered into the record several volumes of Sumners' medical records. We do not agree.

The medical records were potentially relevant to Sumners' credibility as a witness. In viewing Assignments of Error Numbers One and Two, this appeal turned on whether it was reasonable for the jury to make the credibility determination that it made. Thus, we find that Sumners' medical records were properly included in the appellate record.

**CONCLUSION:**

Sumners raised three assignments of error. We find no error in the underlying judgment and affirm. All costs of this appeal are taxed to Sumners.

**AFFIRMED.**